IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31638-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL ALLEN BUDD, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. —

> *Talmadge: Do you remember studying in law school the principle that no matter how humble a man's cottage is, that even the king of England cannot enter without his consent?*
> *Ehrlichman: I am afraid that has been considerably eroded over the years, has it not?*
> *Talmadge: Down in my country, we still think it is a pretty legitimate principle of law.*

Exchange between Georgia's United States Senator Herman Talmadge and former White House Counsel John Ehrlichman, United States Senate Watergate Committee hearings, July 25, 1973.

No. 31638-6-III
*State v. Budd*

The Washington high court, in *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998), held that, before entering a citizen's home without a warrant, a law enforcement officer must ask the citizen for consent, inform the citizen that he can revoke consent at any time, and notify the citizen that he can limit the scope of the entry into the home. We are asked today to decide whether the *Ferrier* holding applies when the law enforcement officer fails to give all *Ferrier* warnings before entering the home, but delivers all warnings before searching the home.

Appellant Michael Allen Budd was convicted of possession of depictions of minors engaged in sexually explicit conduct. He contends that the trial court erred in its denial of his CrR 3.6 motion to suppress evidence obtained in a warrantless search of his residence by the officers investigating the case. He argues (1) the *Ferrier* warnings provided by the detective prior to entering his home were insufficient, and (2) the detective's statement that she "could and would obtain a warrant" if Budd refused to consent to the search, vitiated his consent. The first issue requires us to examine whether the officer uttered all *Ferrier* warnings before entering the home, and, if not, whether providing all admonitions inside the house before searching the house complies with *Ferrier* and the prohibition against unreasonable searches and seizures. Based on the trial court's findings, we rule that the detective did not voice all *Ferrier* warnings before entering the home. We also hold, based on the language of *Ferrier* and other decisions, and based on the purposes behind the *Ferrier* warnings, that a law enforcement officer

2

must deliver all cautions before entering the residence. Therefore, we do not address Budd's second argument. We reverse the denial of the CrR 3.6 motion and dismiss the charge against Budd.

## FACTS

Washington State Patrol's Missing and Exploited Children Task Force received an anonymous "cybertip" from the National Center for Missing and Exploited Children. Clerk's Papers (CP) at 4. The anonymous source declared that Michael Allen Budd communicated with young girls on Yahoo! Messenger and Windows Live Messenger, both free online chat services. The informant stated that, in these chats, Budd talked about molesting his nine-and-a-half-year-old daughter and about engaging in sex with his communicants. The source volunteered that Budd's daughter did not live with him. The anonymous source stated that he or she had seen child pornography on Budd's computer and estimated the amount of pornography to be more than 15 Gb. The informant also provided Michael Budd's Gmail and Yahoo! email addresses, the addresses' respective passwords, and the usernames and passwords for two other profiles associated with the same username as Budd's e-mail addresses, guinness2012.

The Washington State Patrol's Missing and Exploited Children Task Force assigned, for investigation, the Michael Budd inquiry to Lakewood Police Department Detective Kim Holmes. Detective Holmes served a search warrant on Yahoo! and Google and determined that, based on Budd's internet protocol address, he resided in

Ephrata.

On March 11, 2009, Detective Kim Holmes travelled to Ephrata to perform a "knock and talk" and assuage her concerns that Michael Allen Budd's daughter might be in danger. In law enforcement, a "knock and talk" is an investigative technique where one or more police officers approaches a private residence, knocks on the door, and requests consent from the owner to search the residence. Law enforcement performs the "knock and talk" when criminal activity is suspected, but officers lack probable cause to obtain a search warrant. State Patrol Officers Tony Doughty and Jesse Rigalotto accompanied Holmes to Budd's residence. When the three officers arrived, Budd's girlfriend informed them that Budd remained at work. The officers waited in a car for Budd to arrive.

Michael Allen Budd returned home 15 minutes later, and the officers greeted him halfway down his driveway. Kim Holmes identified herself and the other officers, told Budd that they received a tip that he kept child pornography on his computer, and expressed concern for his daughter. Budd insisted that he was not touching or harming his daughter. Budd stated, nevertheless, that he was not surprised that the officers had come. He added: "if you do it long enough, you get caught." Report of Proceedings (RP) at 13. Detective Holmes interpreted Budd's comment to concede he viewed child pornography.

The outcome of this appeal turns on what happened next. In her police report,

4

Detective Kim Holmes wrote that, after Michael Allen Budd admitted to possessing child

pornography, she:

> explained to him knowing this, he could give us consent to [preview] his computer or *I could and would obtain a search warrant.* Budd gave us consent to seize his computer as he explained he did not want us previewing it in front of his girlfriend. Budd signed a WSP consent form and his rights were explained to him.

CP at 4-5. (emphasis added). The report lacked any mention of Holmes' informing

Budd that he had a right to decline consent to enter the home, limit the scope of the

search, and revoke consent at any time. The report implied that Holmes misrepresented

that a court would authorize a search warrant.

Detective Kim Holmes testified during the suppression hearing. Under direct

examination, Holmes testified that she gave Michael Allen Budd a proper *Ferrier*

warning:

> So I explained to him that we wanted to do a preview, basically a search of his computer, and explained to him that if we got consent—he could give us consent and we would just seize the computer. We wouldn't do a search of the house. We would just seize the computer and related media items and that would be it. We'd keep it very low-key. I told him that I would apply for a warrant if he did not want to give consent.
> Q. Okay. And what did the defendant say?
> A. He agreed. He didn't want us to search his house—house in front of his girlfriend, and he did not want us previewing his computer in front of his girlfriend. So that was kind of his stipulations, and we agreed to that.
> Q. So you told him you wanted to search the computer. And he said that was okay, but he didn't want you to do it on certain situations, one of it being at his house with his girlfriend there?
> A. Correct.

5

Q. And you agreed to that?

A. I did.

Q. Okay. Now, are you aware of Ferrier warnings?

A. Yes.

Q. All right. Now, did you advise the defendant in this case of any Ferrier warnings prior to going into the house?

[DEFENSE COUNSEL]: Objection to the phrasing of that. If it could be asked more specifically.

[PROSECUTING ATTORNEY]: I could try to help him out, I guess.

THE COURT: All right.

BY [PROSECUTING ATTORNEY]:

Q. Before going into the house, did you advise the defendant of anything before going into the house to search?

A. I did.

Q. And what's that?

A. When he agreed to give consent, I explained to him that I had a waiver that he would need to sign, and it would give him rights as to how much we could search, that he could stop the search. I didn't go into great detail.

Q. Right.

A. And after that, I went and got the warnings, the Ferrier form, out of my car and brought it. And that's when we went into the house and sat at the table where we could go over it more thoroughly.

Q. Now, after you advised him of the rights with this Ferrier warning set, you know, the right that he can stop the search at any time, the right that you can, you know, allow him to do that, was this advised to him before you went into the house?

A. Yes.

Q. And then did the defendant still, after you advised him of those things, what this warning was, did he still allow you to go into the house?

A. He did. He invited us into the house specifically so that we could sit down at a table and go over the warnings.

Q. All right. But before you did that, you went and picked up something, correct?

A. Right. The form. The preprinted form with the Ferrier warnings written on it.

Q. Okay. And then when you went into the house, who all went in the house?

6

A. I believe we all three went into the house. I know we all three did.

Q. All three meaning the officers?

A. Yes.

RP at 15-17.

Kim Holmes, during the suppression hearing, testified that Michael Budd invited the officers into his home. Despite her initial testimony, Holmes later, in answer to a question from the trial court, stated she is unsure as to whether Budd invited the three into the home for the purpose of reviewing the written form.

In cross-examination during the hearing, Kim Holmes conceded that she would place in her police report everything that has evidentiary value. Upon looking at the report, she further testified that she placed into the report all necessary evidence and she would not wish to change the report.

During cross-examination at the suppression hearing, Kim Holmes' testimony grew vague as to what warnings she gave before entering the house.

BY [DEFENSE COUNSEL]:

Q. Prior to the time that you entered the house, how is it communicated to Mr. Budd that he had the right to call off the search at any time?

A. *Verbatim, I don't recall.* In general, we told him that, you know, we were asking him for consent, and he certainly had the right to deny that consent. He did not have to let us into the house, and he could stipulate his parameters, which he did.

RP at 39 (emphasis added). Then during redirect, Holmes conceded she may not have expressly advised, before entering the home, of the right to stop the search.

7

BY [STATE'S COUNSEL]

Now, you just testified in regards to the Ferrier warnings, the talking prior to going into the house with the defendant there. Now, you stated you advised him that he could deny your entrance into the house?

A. Yes.

*Q. And you advised him that he could stop you or stop the search at any time?*

*A. Maybe not in those words.*

Q. Right.

A. But, you know, *once we went over the Ferrier,* it was exactly those words, yes.

Q. Okay. But I'm talking now before you go into the house what you were talking about in the driveway. Did you advise him about parameters?

A. Yes.

Q. And did the defendant set up parameters before you went into the house?

A. He did.

Q. Okay. And those are the parameters that you testified to earlier?

A. Yes.

Q. About not to search it in front of his girlfriend?

A. That's correct.

Q. And any other parameters that I missed besides that one?

A. Other than he didn't want us going through his entire house—

Q. That's correct. Didn't want—

A. —and her things or whatever.

RP at 40-41 (emphasis added).

Once inside, the law enforcement officers reviewed the *Ferrier* waiver form with Michael Allen Budd at his kitchen table. Budd signed and consented to the seizure of his computer and hard drive. The officers confiscated the computer. The state patrol's review of the computer revealed many images of child pornography.

8

PROCEDURE

The State of Washington charged Michael Allen Budd with one count of

possession of depictions of a minor engaged in sexually explicit conduct in violation of

RCW 9.68A.070. Budd filed a CrR 3.6 motion to suppress evidence. Budd argued that

the evidence obtained via the search of his computer and hard drive should be suppressed

because (1) Detective Holmes improperly obtained Budd's consent when she stated that

she "could and would" obtain a warrant if Budd did not voluntarily consent to a "pre-

view" of his computer, and (2) the officers did not give Budd the warnings required under

*Ferrier* prior to entering his home to review the *Ferrier* consent form.

The trial court held a suppression hearing. Detective Holmes and Grant County

Reserve Deputy Ryan Lavergne testified. Michael Budd did not. The trial court denied

Budd's motion to suppress, holding that (1) Budd consented to the search voluntarily, (2)

the officers did not violate *Ferrier* by entering Budd's home to review his rights before

commencing the search, and (3) Detective Holmes' statement that she would "apply for a

search warrant" if Budd did not consent was not an assertion of authority sufficient to

vitiate Budd's consent. CP at 126-27.

The trial court authored a written ruling and entered findings of fact. The written

ruling quoted from Detective Kim Holmes' police report. The trial court's formal

findings adopted his memorandum ruling. The following is a portion of the ruling:

On March 11, 2009, Detective Holmes, and two other troopers

9

contacted the Defendant outside a residence in Ephrata. Detective Holmes
spoke with the Defendant. She explained why she was there and the
Defendant approached and admitted possessing hundreds of images
depicting minors involved in "sexually explicit conduct." Detective
Holmes asked the Defendant for consent to enter his home and search his
computer. The Defendant asked if the detective had a warrant. The
detective replied that she would apply for a warrant if he did not consent.
The Defendant told the detective he did not want his computer previewed in
front of his girlfriend. The troopers agreed not to view the computer's
contents in view of the Defendant's girlfriend. The Defendant then gave
consent to entry of his home for the purpose of searching his computer.
Upon entering the Defendant's home and before searching the computer,
the troopers went over a written consent form with the Defendant which
contained all the warnings associated with State v. Ferrier, 136 [Wn.] 2d
103, 960 P 2d, 927 (1998). The Defendant signed the document
acknowledging he understood and reaffirming his consent. The troopers
seized the Defendant's computer but did not arrest the Defendant.

CP at 405. In his written ruling, the trial court made no mention of any *Ferrier* warnings

before entry of the home. In his written memorandum, the trial court ruled:

> I further conclude that the troopers did not violate Ferrier by entering
> the home initially to go over the Defendant's rights before commencing the
> search. There appears to be no controlling authority on this question. But,
> the purpose of the Ferrier warnings is to prevent a search before advisement
> of rights. Here, no search was conducted before the defendant was advised
> of his Ferrier rights, and the purpose of the Ferrier warnings was
> accomplished.

CP at 407.

Michael Allen Budd and the State of Washington agreed to a stipulated facts

bench trial. The trial court found Budd guilty of possession of depictions of a minor

engaged in sexually explicit conduct in violation of RCW 9.68A.070. The court

sentenced Budd to 13 months in prison, and 36 months community custody.

10

LAW AND ANALYSIS

*Findings of Fact*

We must first identify the facts upon which to base our decision. In doing so, we must initially determine what evidence the trial court reviewed when addressing Michael Budd's motion to suppress. Our dissenting brother faults us for relying, in part, on Detective Kim Holmes' police report in our statement of facts. Our dissenting brother writes that the trial court only listened to the testimony of two officers, Kim Holmes and Ryan Lavergne. The dissent is wrong. In his memorandum opinion later incorporated into the findings of fact, the trial court references and quotes from Holmes' police report. Therefore, the trial court necessarily considered the report. Neither party, on appeal, objects to the trial court's reliance on the report when issuing the decision denying the motion to suppress.

We now must identify the facts found by the trial court on its review of the police report and hearing of live testimony. If the trial court found that Detective Kim Holmes gave Michael Allen Budd the *Ferrier* warnings before Holmes entered the Budd residence, we would affirm the denial of Budd's motion to suppress the photographs found on his computer. The trial court found otherwise.

The resolution by a trial court, of differing accounts of the circumstances surrounding the encounter, are factual findings entitled to great deference. *State v. Harrington*, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). It is the trial court's role to

11

resolve issues of credibility and to weigh evidence. *State v. Crane*, 105 Wn. App. 301, 306, 19 P.3d 1100 (2001), *overruled on other grounds by, State v. O'Neill*, 148 Wn.2d 564, 62 P.3d 489 (2003). But the ultimate determination of whether those facts constitute a violation of the constitution is one of law and is reviewed de novo. *Harrington*, 167 Wn.2d at 662; *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008). Therefore, we accept the trial court's findings of the bare facts uninfected by any inferences and unencumbered by legal significance. We accept the trial court's findings as to the actions taken by law enforcement officers or not taken by the officers.

A trial court's written memorandum of opinion may be considered in interpreting the court's findings of fact and conclusions of law. *In re Marriage of Tahat*, 182 Wn. App. 655, 672, 334 P.3d 1131 (2014). Our trial court went further and incorporated the memorandum opinion into the findings of fact.

Deferring to the trial court is critical in this appeal, because of the varying testimony of Detective Kim Holmes concerning the time at which she gave all *Ferrier* warnings to Michael Budd. Detective Holmes, according to her police report, told Budd that he could give consent to preview his computer or "*I could and would obtain a search warrant.*" CP at 4 (emphasis added). The report further mentioned that, after entry into the home, Budd signed a Washington State Police consent form and his rights were explained to him. Nothing in the police report suggested that *Ferrier* warnings were given before entry. Holmes testified she included in the report all necessary evidence.

12

The police report strongly implies that all *Ferrier* warnings were not given before the
officers entered Budd's house.

During the suppression hearing, Holmes testified:

> [BY MR. OWENS State's counsel]:
> Q. Now, after you advised him of the rights with this Ferrier
> warning set, . . . the right that he can stop the search at any time, . . . was
> this advised to him before you went into the house?
> A. Yes.

RP at 17. But her later testimony was equivocal:

> BY MR. DE YOUNG [defense counsel]:
> Q. Prior to the time that you entered the house, how is it
> communicated to Mr. Budd that he had the right to call off the search at any
> time?
> A. Verbatim, I don't recall. In general, we told him that, you know,
> we were asking him for consent, and he certainly had the right to deny that
> consent. He did not have to let us into the house, and he could stipulate his
> parameters, which he did.

RP at 39.

The State argues any ambiguity in what Holmes communicated to Budd regarding
his *Ferrier* rights was clarified on the State's redirect of her:

> [BY MR. OWENS:]
> Q. And you advised him that he could stop you or stop the search at
> any time?
> A. Maybe not in those words.
> Q. Right.
> A. But, you know, *once we went over the Ferrier*, it was exactly
> those words, yes.
> Q. Okay. But I'm talking now before you go into the house what
> you were talking about in the driveway. Did you advise him about
> parameters?

13

A. Yes.

RP at 41 (emphasis added). To the contrary, the testimony suggests Holmes did not advise of the right to stop the search until entry of the home. The changing testimony of Kim Holmes illustrates the observation of one trial court that an interrogatee can be led down any path and opposite paths depending on the interrogator. *State v. Cross*, 156 Wn.2d 580, 597, 132 P.3d 80 (2006).

In response to questioning by defense counsel, Holmes did not recall if she gave every *Ferrier* warning before entering the home. Some of her testimony, in response to the prosecution's questioning, infers that she did not give all of the warnings until she reviewed the written form with Michael Budd inside the house.

This reviewing court does not resolve any ambiguity in the testimony. The trial court justifiably found that the *Ferrier* warnings were not given until the officers were inside the home. The trial court wrote in its memorandum: "Upon entering the Defendant's home and before searching the computer, the troopers went over a written consent form with the Defendant which contained all the warnings associated with *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998)." CP at 405. The trial court made no mention of any *Ferrier* warnings before entry of the home.

The State had the burden of showing all *Ferrier* warnings were given before entry into the residence. *State v. Ferrier*, 136 Wn.2d 103, 116, 960 P.2d 927 (1998). An absence of a finding that all warnings were given before entry is tantamount to a finding

14

they were not given. The absence of a finding on a material issue is presumptively a negative finding entered against the party with the burden of proof. *Golberg v. Sanglier*, 96 Wn.2d 874, 880, 639 P.2d 1347 (1982); *Pilling v. E. & Pac. Enters. Trust*, 41 Wn. App. 158, 165, 702 P.2d 1232 (1985).

Later in the memorandum, the trial court ruled that "the troopers did not violate Ferrier by entering the home initially to go over the Defendant's rights before commencing the search." CP at 407. The trial court would not have ruled as it did unless it found the full warnings were not given until inside the home.

Despite the trial court's ruling, our dissenting brother insists that the trial court found that the law enforcement officers gave all *Ferrier* warnings before entry into the home. We wish such were true. Unfortunately, our brother does not cite to any portion of the record supporting the claimed finding. Perhaps conceding that the trial court did not find that all warnings preceded the home entry, our brother claims that the giving of the full warnings before entry of the home was an uncontested fact. To the contrary, as shown by the extensive brief filed by Michael Budd in support of his motion to suppress, Budd contended he was given no *Ferrier* warnings before the home entry. In fact, Budd claimed his computer was seized and disassembled before he was given the warnings. Budd devoted pages of argument in his motion memorandum based on his factual position that "all of the required Ferrier warnings were not given until the detectives were already inside the house and the seizure had commenced." CP at 16. Our dissenting

15

brother contends that, by our citing to Budd's memorandum, we use the memorandum to establish facts. To the contrary, we cite Budd's memorandum to confirm his contentions below, not facts.

Before moving to the substance of the appeal, we mention in passing our dissenting brother's assertion that Michael Allen Budd exploited the officers by inviting them inside his home to conduct the written waiver. We doubt that Michael Budd and for that matter most accused are sophisticated enough to trick law enforcement officers into entering the home before giving *Ferrier* warnings, so that any charges must later be dismissed. The trial court made no finding of Budd engaging in trickery. Anyway, Kim Holmes testified that Michael Allen Budd invited the officers inside, but not necessarily for the purpose of reviewing and signing the warnings form.

Our dissenting brother refers to the police encounter as occurring "on a late winter's afternoon," as if the law enforcement officers were tricked into entering the home, before delivering all warnings, because of the ambient temperature. Dissent at 1. Nevertheless, there is no evidence as to any chill in the air. The date was March 11.

## Ferrier Warnings

Like Ernesto Miranda, the subject of *Miranda v. State of Arizona*, and John Terry, the subject of *Terry v. Ohio*, Debra Ferrier, the accused in *State v. Ferrier*, sacrificed her name to a legal doctrine about police practices. Michael Allen Budd argues that law enforcement officers seized his computer and hard drive without sufficiently advising

16

him of the *Ferrier* warnings before entering his home. Budd maintains that the warnings must be explicit, that Detective Holmes could not merely tell Budd he had a right to refuse the search, and that Holmes could not wait to apprise him of his other *Ferrier* rights until inside his house. We agree.

Warrantless searches, such as the "knock and talk" entry at issue in this case, are "unreasonable per se" under article I, section 7 of the Washington Constitution. *State v. Ferrier*, 136 Wn.2d at 111; *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996), *overruled on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). Exceptions to the requirement that law enforcement obtain a warrant are jealously and carefully drawn and are limited to those cases where the societal costs of obtaining a warrant, such as danger to law enforcement or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate. *Ark. v. Sanders*, 442 U.S. 753, 759, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), *abrogated by California v. Acevedo*, 500 U.S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991); *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980). Courts do not look kindly on law enforcement's failure to obtain a search warrant when police have ample opportunity to perform the task. *State v. Ferrier*, 136 Wn.2d at 115; *State v. Leach*, 113 Wn.2d 735, 744, 782 P.2d 1035 (1989).

The "knock and talk" technique involves entering a private home. Constitutional privacy protections are strongest in the home. *Payton v. New York*, 445 U.S. 573, 590,

17

100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State v. Ruem*, 179 Wn.2d 195, 200, 313 P.3d 1156 (2013); *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994). The Fourth Amendment draws a firm line at the entrance to the home. *Payton v. New York*, 445 U.S. at 590. "[A]ll invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life" are subject to constitutional protection. *Boyd v. United States*, 116 U.S. 616, 630, 6 S. Ct. 524, 29 L. Ed. 746 (1886). The home, as a highly private place, receives heightened constitutional protection. *State v. Young*, 123 Wn.2d at 185. Because of the surprise element of law enforcement officers ringing the doorbell, and the intimidation of officers inviting themselves indoors, any "knock and talk" is inherently coercive to some degree. *Ferrier*, 136 Wn.2d at 115. The fact that most individuals consent to a search when the search destroys their penal interests illustrates the coercive nature of the "knock and talk." *Ferrier*, 136 Wn.2d at 116.

In *Ferrier*, police conducted a warrantless search of Debra Ferrier's home based on a tip from her son that she grew marijuana in her house. 136 Wn.2d at 106. The police decided to "knock and talk" in order to avoid disclosing their informant and because they lacked probable cause. Four officers entered Ferrier's house, informed her they had a tip she was growing marijuana, told her they wanted to search her house and seize the plants, and then reviewed a "consent to search" form with her before she signed. The officers found the plants in a locked room and seized them, along with a large amount of cash from Ferrier's purse.

18

In *Ferrier*, the high court noted that a law enforcement officer's failure to inform a homeowner of the right to decline a search does not automatically invalidate the search under federal law. 136 Wn.2d at 110. Instead, the omission of this information is a factor in determining the voluntariness of the search. *United States v. Heimforth*, 493 F.2d 970 (9th Cir. 1974). Thus, our eminent court addressed whether the Washington Constitution afforded greater protection to the accused.

Article I, section 7 of our state's constitution provides that "no person shall be disturbed in his private affairs, or his *home invaded*, without authority of law." (Emphasis added.) The United States Constitution's Fourth Amendment also mentions security in "houses." The *Ferrier* court held that the Washington Constitution provides added safeguards, in part, because the wording of the state document expresses no limitations to an individual's right to privacy.

In reversing the trial court's denial of *Ferrier's* CrR 3.6 motion, the Supreme Court imparted explicit instructions to law enforcement officers who seek to execute a "knock and talk" in Washington State:

> [W]hen police officers conduct a knock and talk *for the purpose of obtaining consent to search a home*, and thereby avoid the necessity of obtaining a warrant, *they must, prior to entering the home, inform* the person from whom consent is sought that he or she may lawfully *refuse* to consent to the search and that they can *revoke*, at any time, the consent that they give, and can *limit* the scope of the consent to certain areas of the home. *The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.*

*Ferrier*, 136 Wn.2d at 118-19 (emphasis added).

The *Ferrier* court based its ruling on numerous observations. The home receives heightened constitutional protection. 136 Wn.2d at 118. In no area is a citizen more entitled to his or her privacy than in the home. 136 Wn.2d at 112. The closer officers come to intrusion into a dwelling, the greater the constitutional protection. 136 Wn.2d at 112. RCW 10.79.040 creates the misdemeanor of a law enforcement officer entering and searching a private dwelling without the authority of a search warrant. Law enforcement officers should obtain a search warrant except in emergency situations. The great majority of home dwellers confronted by police on their doorstep or in their home would not question the absence of a search warrant and will feel inhibited from asking for a warrant. 136 Wn.2d at 115. Home dwellers will be too stunned by the circumstances to render a reasonable decision about whether to consent to a home search. 136 Wn.2d at 115. One wonders, however, if giving the *Ferrier* warnings will settle the nerves of the homeowner and lessen the inhibition to deny consent.

Since its 1998 ruling, our Supreme Court has reiterated that the warnings must be given if the officer seeks to enter the home to conduct a warrantless search for evidence of a crime or contraband. *State v. Khounvichai*, 149 Wn.2d 557, 566, 69 P.3d 862 (2003); *State v. Ruem*, 179 Wn.2d 195, 206, 313 P.3d 1156 (2013). Washington courts, however, have clarified that *Ferrier* warnings are not always required when a law enforcement officer enters a private residence without a warrant. *State v. Ruem*, 179

Wn.2d at 206; *State v. Khounvichai*, 149 Wn.2d at 563; *State v. Williams*, 142 Wn.2d 17, 26, 11 P.3d 714 (2000); *State v. Bustamante-Davila*, 138 Wn.2d 964, 976, 983 P.2d 590 (1999); *State v. Leupp*, 96 Wn. App. 324, 333, 980 P.2d 765 (1999). For example, the admonitions need not be given when an officer enters a home in response to a distress call. *State v. Leupp*, 96 Wn. App. at 333-34 (1999). *Ferrier* warnings are not needed if a law enforcement officer accompanies an immigration agent inside a home to deport an individual, *State v. Bustamante-Davila*, 138 Wn.2d at 976; nor are the warnings demanded if the officer enters the home to arrest an occupant pursuant to an arrest warrant. *State v. Ruem*, 179 Wn.2d at 197; *State v. Williams*, 142 Wn.2d at 27. The *Ferrier* admonitions are not prudent when the homeowner invites the officer inside to investigate a crime. *State v. Khounvichai*, 149 Wn.2d at 564; *State v. Williams*, 142 Wn.2d at 27.

The facts in the cases limiting *Ferrier* are inapposite here. This appeal entails a classic use of the "knock and talk" method of attempting to coerce consent to search inside a house when law enforcement lacks probable cause.

The trial court ruled that it is permissible to give some of the warnings once an officer has already entered the house. Nevertheless, no Washington decision permits this practice. *Ferrier* does not stand for such a rule. *Ferrier*, 136 Wn.2d at 110 talks at length about the heightened privacy protections afforded by Washington Constitution article I, section 7, and the special protections available to an individual in their home.

21

136 Wn.2d at 112, 114, 118. Finding that *Ferrier* only requires an advisement of its warnings prior to a search, and not entry into the home itself, defeats the purpose of the case's explicit directions to law enforcement personnel that the warnings be given before entry.

*Ferrier* expressly demands that all warnings be given before entry of the home. 136 Wn.2d at 118-19. Later decisions refer to the rule as requiring warnings before entry into the home. *State v. Ruem*, 179 Wn.2d at 201, 205; *State v. Khounvichai*, 149 Wn.2d at 559; *State v. Williams*, 142 Wn.2d at 25; *State v. Bustamante-Davila*, 138 Wn.2d at 978. Any erosion of the *Ferrier* rule should come from our Supreme Court.

Sound reason supports a demand that law enforcement give the *Ferrier* warnings before entry into the house. A house is considered a castle and entitled to the greatest protection from government entry and roaming. The intrusion into privacy begins at the home's threshold. Once the police enter the home, seizure of contraband in plain view is open season. Coercion increases once the officer is inside and in confined quarters with the suspect. The camel's nose is inside the tent and its entire body will soon follow. Once inside the house, the police may further manipulate the suspect into agreeing to an unending search. Resistance to a voluntary search of recessed areas of the home is lessened.

Michael Allen Budd was not inside when first approached by law enforcement. Instead, police waited outside the home and approached him on his driveway when he

arrived home. We see no reason to distinguish the facts on appeal, however, from the facts in *Ferrier*. The arrival of the police was a surprise. Michael Budd lacked time to reflect before being asked to consent to an inside search. Budd's questioning Kim Holmes if she had a search warrant shows some skepticism and intelligence on his part. Nevertheless, Holmes immediately stated she would seek a warrant. The officers then played to Budd's fears of his girlfriend viewing the contents of his computer.

Unlike in other home entries, law enforcement here did not necessarily seek to roam the entire house, but to grab a computer and hard drive. Our dissenting brother suggests that warnings were not needed because the officers did not seek to search the home. We see no important difference, however, for constitutional purposes. The officers could not seize the computer without entering and searching the home. Budd's computer was inside his house, in part, for privacy reasons. The officers entering Michael Budd's home would have seized any contraband found in plain view.

Our dissenting brother writes that we announce in dicta that "written consent obtained after entry into the house somehow vitiated the actual informed consent given prior to entry." Dissent at 7. We do not announce such either by a holding or by dicta. We instead hold that Michael Budd did not give informed consent for entry of his home, since the officers failed to give all of the *Ferrier* warnings before entry.

Remember that law enforcement went to Michael Allen Budd's home out of concern for his daughter. After speaking to Budd's girlfriend, the officers had no reason

23

to believe the daughter was present. The officers did not end the operation, however. The officers engaged in a knock and talk despite having an opportunity to seek a warrant. They likely did not seek a warrant because they understood a judge would not issue a warrant.

Viewing child pornography is a hideous crime that robs children of innocence and scars them for life. Those who watch child pornography obsessively garner gratification through violent acts on defenseless children. Catching one at the crime takes diligence since the viewer indulges in the privacy of his home, often by elaborate security measures on his computer. Thus, we reluctantly reverse the trial court. Nevertheless, as judges, we pledged to uphold the constitution and the endearing rights protected by the constitution. Those engaged in hideous conduct are entitled to the protections afforded under our state and federal constitution including the right to be free of unlawful searches and seizures. We also will not manipulate the facts in order to facilitate a desired outcome. We commend the trial court for its refusal to manipulate the facts in this difficult case.

We would remand the case for trial if evidence other than the content of the seized computer was sufficient to convict. Nevertheless, Michael Budd's comment that he would eventually get caught would be insufficient without evidence of videos or photographs. Extrajudicial admissions and confessions are inadmissible unless the State submits independent proof of the corpus delicti. *State v. DuBois*, 79 Wn. App. 605, 609, 904 P.2d 308 (1995); *State v. Solomon,* 73 Wn. App. 724, 727, 870 P.2d 1019 (1994).

24

By our ruling, we do not criticize law enforcement officers who employ the technique of "knock and talk." The technique remains lawful, within the strictures of *State v. Ferrier*, and we recognize that diligent and honest officers will continue to use this method of investigating crime. By our ruling, we follow our high court's precedent of *State v. Ferrier* and confirm that all *Ferrier* warnings must be given before entry into the home.

## CONCLUSION

We reverse the trial court's denial of Michael Allen Budd's motion to suppress evidence resulting from the seizure of his computer and hard drive. We remand with directions to dismiss the charge against Budd.

_____
Fearing, J.

I CONCUR:

_____
Lawrence-Berrey, J.

No. 31638-6-III

KORSMO, J. (dissenting) — No good deed goes unpunished. Or, in this case,

unexploited. Mr. Budd offered to conduct the *written* advice and *written* waiver of search

consent rights in his house after agreeing *orally* to the seizure of his *computer* and its

peripherals while outside the residence. Acting on his generous offer, while undoubtedly

wishing to keep Mr. Budd in a consenting mood, the officers followed him into the house

and processed their paperwork inside rather than trying to persuade him to stay outside on a

late winter's afternoon. That is all that took place here. Unfortunately, the majority fails to

defer to the trial court's actual finding that consent was given prior to entering the house in

favor of its own view of the evidence. Although there is an interesting legal issue

presented concerning one aspect of *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998),

that issue gets lost in the analysis.

While the majority errs in several respects, its reweighing of evidence and reliance

on extraneous evidence that was not considered at the suppression hearing is probably the

most serious concern here. The court's sparse findings of fact are clear on this point: the

*only evidence* considered at the CrR 3.6 hearing was the *testimony* of Detective Holmes

and Deputy Lavergne. Clerk's Papers (CP) at 402.[1] Accordingly, the police reports cited

---

[1] The majority, amazingly, confuses defense counsel's trial memorandum
argument with evidence. While that document contended the evidence would show Mr.
Budd did not consent to entry, it is not itself evidence of what took place. The sole
evidence of what occurred was the testimony of the two officers, uncontested by any
competing testimony from Mr. Budd or anyone else.

by the majority were not a part of the substantive evidence considered at the suppression hearing. They provide no basis for overturning the court's finding and, most certainly, cannot be relied on for that purpose in this court.

It also was expressly noted that Mr. Budd did not testify. CP at 402. The only testimony before the court was that the *Ferrier* warnings were given prior to entry into the house. It was in this context that the court made its determination that consent was given to enter the home to seize the computer. CP at 405. The existence of *Ferrier* warnings was an uncontested fact.[2] Although the defense memorandum argued otherwise, there was no evidence to support the argument. Instead, the only testimony was that full *Ferrier* warnings were given prior to entry. The trial court was free to believe or disbelieve that testimony; it chose to believe the officers. Accordingly, there is no basis for determining that the trial court's ruling that consent was given was somehow unclear. As framed by the defense, the issue at the CrR 3.6 hearing was whether or not the warnings were fully given. The evidence and ruling were that they were. That should be the end of the story.

Appellate courts will review the evidentiary record when a party claims the evidence does not support a particular finding. *E.g.*, *State v. Hill*, 123 Wn.2d 641, 644-45,

---

[2] Prior to amendment effective January 2, 1997, CrR 3.6 used to require the findings to reflect the uncontested facts as well as the court's resolution of the *contested* facts; the uncontested facts were taken as a given. *See* 130 Wn.2d 1101. After amendment, the court is required to enter findings of fact without reference to what was contested and what was not. The uncontested facts now sometimes get overlooked in that process.

870 P.2d 313 (1994) (rejecting line of authority permitting appellate courts to undertake independent review of the evidence). However, we do not weigh the evidence under any circumstance. *E.g.*, *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959); *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). We similarly do not substitute our judgment for that of the trier of fact. *Hesperian*, 54 Wn.2d at 575. Whether the facts are as the parties allege is for the trial judge to determine, not this court. *Id.* Thus, much of the majority's opinion is a misplaced exercise.

But, even if we were to reweigh the evidence, the testimony that the majority cites does not support its argument. Immediately after citing to the detective's testimony on direct examination that the *Ferrier* rights were given, the majority cites to the following cross-examination question: "Prior to the time you entered the house, how is it communicated to Mr. Budd that he had the right to call off the search at any time." Majority at 13. The question accepts the truth of the detective's testimony that the warnings were given prior to entry and focuses on the verbiage used to convey the concept that Mr. Budd retained the right to change his mind and stop the search. The detective then answered that question by stating that she did not recall the verbatim language and gave some irrelevant examples of what might have been said on other aspects of search consent. From that, the majority seems to infer that she failed to give any information to Mr. Budd,

3

prior to entering the house, about his right to stop the search at any time. That inference simply does not follow from the answer, "I do not recall." Failure to recall specific verbiage is not the same thing as failing to provide the information. However, even if that were a possible interpretation of the answer, the remaining problem is that it is not our interpretation to make. The trial judge heard that testimony and had no trouble squaring it with the remaining evidence. We have no authority to reweigh evidence and reach a different result.

The last point to be addressed on this topic involves the quality of the findings. The formal findings are nearly nonexistent, but at least incorporate the trial judge's lengthy and thoughtful memorandum. It is unfortunate that the formal findings are not more detailed and merely incorporate, instead of being supplemented by, the judge's memorandum. While I think the judge's memorandum adequately answers the question that troubles the majority, there is a remedy for findings that are insufficient. When the findings are not clear or fail to address an important point, the remedy is to remand for better findings. *State v. Head*, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998) (no findings prepared); *State v. Alvarez*, 128 Wn.2d 1, 904 P.2d 754 (1995) (bench trial findings lacking ultimate facts); *State v. Barber*, 118 Wn.2d 335, 342, 823 P.2d 1068 (1992) (insufficient findings from CrR 3.6 hearing). If it does not understand the judge's finding,

4

the majority's answer is to ask for clarification rather than search for evidence of ambiguity to impeach the trial court. *Id.*

For all of the noted reasons, we need not even consider the *Ferrier* problems presented here. However, since the majority addressed *Ferrier*, I briefly will do the same. Of course, the first issue is whether *Ferrier* actually applies here. The majority begins its analysis by understating the *Ferrier* holding. It cites the rule of *Ferrier* as requiring informed consent prior to law enforcement entering a home. Majority at p. 1-2. While correct as far as that observation goes, it is incorrect in context. The actual rule of *Ferrier* applies only "when police officers conduct a knock and talk for the purpose of obtaining consent to search a home." 136 Wn.2d at 118.[3] It is not mere entry into the home that is prohibited, absent informed consent, but entry for the specific purpose of obtaining consent to search the home. This case does not involve that standard—the officers did not enter the house to obtain consent, but, rather, to seize a specific, identified item. Further,

---

[3] The majority also reads too much into *Ferrier*. At issue there was an unconfirmed tip that Ms. Ferrier was growing marijuana in her home. The police hoped to enter and then obtain her consent to search. *Ferrier*, 136 Wn.2d at 107. However, if they managed to smell growing marijuana from inside the home, the officers would then have probable cause to obtain a search warrant. *E.g., State v. Cole*, 128 Wn.2d 262, 289, 906 P.2d 925 (1995). That supplied a second reason, in addition to the coercive aspects of police seeking consent after entry, which undoubtedly supplied the rationale for requiring informed consent prior to entry. If the informed consent were not extended back prior to entry, officers could easily evade *Ferrier* simply by stating that they sought entry to obtain sensory evidence to support a search warrant rather than to obtain the homeowner's consent to search.

their objective never was to search the house. Instead, they sought to obtain only the defendant's computer. For both those reasons, the literal holding of *Ferrier* does not apply here because the officers never sought to search the house.[4]

Because the police used the enhanced consent standard of *Ferrier*, the parties and the trial court necessarily considered this case in that light.[5] However, it is far from clear under *Ferrier* that the case had to be analyzed that way. The consent form actually limits the search consent to one item—a "blue tower" "generic desk top computer" that was "located in livingroom on desk." CP at 185. The form also advised Mr. Budd that he could lawfully refuse to consent to the search, he could revoke his consent at any time, that he could limit the scope of the search "to certain areas of the computer system(s) and/or storage devices," and that any evidence found during the search could be used in court against him or someone else. CP at 185. Given the very specific and limited nature of the customized search consent sought by the officers, it is very difficult to understand why it needed to be done outside the house. The Washington Supreme Court has declined to apply the *Ferrier* warnings to police entry into homes to obtain information or seize

---

[4] We recently declined to extend *Ferrier* to vehicle searches and in the process noted that the Washington Supreme Court itself has not applied *Ferrier* outside of the house search context. *See State v. Witherrite*, -- Wn. App. --, 339 P.3d 992 (2014).

[5] It is a "best practice" to use the enhanced *Ferrier* warnings when consent is sought. *State v. Witherrite*, -- Wn. App. --, 339 P.3d 992 (2014).

individuals. *E.g.*, *State v. Khounvichai*, 149 Wn.2d 557, 69 P.3d 862 (2003) (*Ferrier* warnings not required where police request entry to a home merely to question or gain information regarding an investigation); *State v. Williams*, 142 Wn.2d 17, 27-28, 11 P.3d 714 (2000) (*Ferrier* warnings not required where police request consent to enter a home to arrest a visitor under a valid warrant); *State v. Bustamante-Davila*, 138 Wn.2d 964, 983 P.2d 590 (1999) (same). The computer, which was seized only after a personalized consent form was explained and approved by Mr. Budd, does not itself have greater privacy rights inside the home than he did.

Finally, the majority in dicta resolves the actual issue addressed by the trial court, which is whether written consent obtained after entry into the house somehow vitiated the actual informed consent given prior to entry. I agree with the majority that oral advice of rights prior to entry is sufficient. Written proof of waiver is preferred, but *Ferrier* does not require it. That decision simply reiterates that the State bears the burden of proving the informed consent and gives several examples of cases where that burden was met by use of written advice. *State v. Ferrier*, 136 Wn.2d at 116-17. Thus, in cases where consent was given prior to entry, the scrivener's act of reducing that consent to writing can occur inside the house.

No. 31638-6-III—Dissent
*State v. Budd*

The majority errs in its reweighing of evidence (and consideration of nonevidence) from the CrR 3.6 hearing, and it errs in applying *Ferrier* to these facts. For both reasons, I respectfully dissent.

_____
Korsmo, J.

8