**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current version, go to https://www.lexisnexis.com/...

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 19 2016
Madsen, C J
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 91529-6 |
| Petitioner, | ) | |
| v. | ) | En Banc |
| MICHAEL ALLEN BUDD, | ) | |
| Respondent. | ) | Filed MAY 19 2016 |

WIGGINS, J.—The issue before us is whether police officers must give a resident the *Ferrier* warnings[1] before making a warrantless, consent-based entry into the resident's home in order to seize an item containing suspected contraband. We hold that the *Ferrier* warnings are required under such circumstances. In this case, the trial court found that the officers did not give Michael Budd the *Ferrier* warnings before making a warrantless, consent-based entry into Budd's home to seize his computer. Based on this finding, the Court of Appeals correctly ruled that Budd's consent was invalid. We therefore affirm the Court of Appeals.

---

[1] As described later in this opinion, the rights contained within the *Ferrier* warnings are the rights to refuse consent to search the home without a warrant, withdraw consent, and limit the scope of the search. *State v. Ferrier*, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FACTS

On January 15, 2009, the Washington State Patrol received an anonymous cybertip from the National Center for Missing and Exploited Children. The tip alleged that Budd possessed child pornography on his computer, used Internet messaging services to communicate with minors, and bragged about molesting his nine-and-a-half-year-old daughter. This tip also contained Budd's e-mail addresses and a copy of two sexually explicit chat conversations.

With the information from the cybertip, Detective Kim Holmes obtained search warrants for information from Yahoo! Inc. and Google Inc. regarding Budd's online activities. However, these warrants did not lead to any relevant information regarding what was alleged in the cybertip. Detective Holmes did not obtain any other search warrants.

Without a search warrant, Detective Holmes, accompanied by two other officers, went to Budd's home to ask for his permission to search his computer. The officers met Budd in his driveway, and the trial court found that the following series of events took place:

> [Detective Holmes] explained why she was there and [Budd] approached and admitted possessing hundreds of images depicting minors involved in "sexually explicit conduct." Detective Holmes asked [Budd] for consent to enter his home and search his computer. [Budd] asked if the detective had a warrant. The detective replied that she would apply for a warrant if he did not consent. [Budd] told the detective he did not want his computer previewed in front of his girlfriend. The troopers agreed not to view the computer's contents in view of [Budd's] girlfriend. The Defendant then gave consent to entry of his home for the purpose of searching his computer. Upon entering [Budd's] home and before searching the computer, the troopers went over a written consent form with [Budd,] which contained all the warnings associated with State v. Ferrier, 136 [Wn.]2d 103, 960 P.2d 927 (1998). [Budd] signed the

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

document acknowledging he understood and reaffirming his consent. The troopers seized [Budd's] computer but did not arrest [Budd]. The computer was later forensically analyzed and found to contain images of child pornography.

Clerk's Papers (CP) at 405.

Referencing the child pornography that the officers found on Budd's computer, the officers applied for, and received, a warrant to return to Budd's home and seize any additional computers and associated paraphernalia. When the officers executed this warrant, they seized several additional computers, some of which also contained child pornography. With this evidence, the State charged Budd with one count of possession of depictions of a minor engaged in sexually explicit conduct in violation of RCW 9.68A.070. Budd filed a motion to suppress the evidence from his computer, arguing in part that the search was illegal because the officers did not give him the *Ferrier* warnings before entering his home.

After a hearing on the motion to suppress, which included testimony by Detective Holmes, the trial court denied Budd's motion. Focusing exclusively on the events that took place inside of Budd's home, the court concluded that

> the troopers did not violate <u>Ferrier</u> by entering the home initially to go over [Budd's] rights before commencing the search. There appears to be no controlling authority on this question. But, the purpose of the <u>Ferrier</u> warnings is to prevent a search before advisement of rights. Here, no search was conducted before [Budd] was advised of his <u>Ferrier</u> rights, and the purpose of the <u>Ferrier</u> warnings was accomplished.

CP at 407.

Thereafter, the trial court found Budd guilty in a bench trial based on stipulated materials, including Detective Holmes's police report and testimony from the suppression hearing. Budd appealed his conviction on the ground that the evidence

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from his computer should have been suppressed because the officers did not give him the *Ferrier* warnings before entering his home. The Court of Appeals, Division Three, reversed in a split decision. *State v. Budd*, 186 Wn. App. 184, 207, 347 P.3d 49 (2015). The Court of Appeals reasoned that the trial court necessarily found that Budd was not given the *Ferrier* warnings before entering the home, and *Ferrier* mandates that Budd should have received the warnings before the officers entered his home. *Id.* at 199, 205-07. We granted the State's petition for review.

## ANALYSIS

We hold that Budd's consent was invalid because the officers did not give him the *Ferrier* warnings before entering his home. In Section II of this opinion, we reaffirm our *Ferrier* rule and hold that it applies to this case. In Section III, we hold Budd's consent was invalid based on the trial court's finding that the officers did not give Budd the *Ferrier* warnings before entering his home.

I.  Standard of review

We review constitutional issues de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). When a trial court denies a motion to suppress, we also review that court's conclusions of law de novo. *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009).

II. *Ferrier* applies to this case

   A. *Officers conducting a knock and talk must give the resident the* Ferrier
      *warnings before entering the home*

Washington's Constitution states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, §

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

7. Article I, section 7 encompasses the privacy expectations protected by the Fourth Amendment to the United States Constitution and in some cases may provide greater protection than the Fourth Amendment because the section 7 protections are not confined to the subjective privacy expectations of citizens. *State v. Myrick*, 102 Wn.2d 506, 510-11, 688 P.2d 151 (1984). A search under article I, section 7 "occurs when the government disturbs 'those privacy interests which citizens of this state *have held, and should be entitled to hold*, safe from governmental trespass absent a warrant.'" *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014) (quoting *Myrick*, 102 Wn.2d at 511). "The expectation of privacy in the home is clearly 'one which a citizen of this state should be entitled to hold.'" *Ferrier*, 136 Wn.2d at 118 (quoting *City of Seattle v. McCready*, 123 Wn.2d 260, 270, 868 P.2d 134 (1994)); *see also State v. Ruem*, 179 Wn.2d 195, 200, 313 P.3d 1156 (2013) ("Constitutional protections of privacy are strongest in the home."). Therefore, a government search of a home is a search under article I, section 7 and must be supported by "authority of law." CONST. art. I, § 7.

When article I, section 7 attaches to a particular search, the "'authority of law'" required is a valid warrant or a recognized exception to the warrant requirement. *Hinton*, 179 Wn.2d at 868-69. The State bears the burden of proof if it relies on an exception to the warrant requirement to justify a particular search. *See State v. Potter*, 156 Wn.2d 835, 840, 132 P.3d 1089 (2006).

One recognized exception to the warrant requirement is voluntary consent. *State v. Khounvichai*, 149 Wn.2d 557, 562, 69 P.3d 862 (2003) (citing *State v. Hendrickson*, 129 Wn.2d 61, 71, 917 P.2d 563 (1996)). As it is an exception to the

warrant requirement, the State bears the burden of proving voluntary consent when it obtains consent through a procedure known as a knock and talk. *Id.* at 561. During a knock and talk, officers go to a home without a warrant and ask for the resident's consent to search the premises. *See id.* When officers conduct a knock and talk, they must give the resident a prescribed set of warnings, informing the resident of his or her constitutional rights. *See Ruem*, 179 Wn.2d at 206; *State v. Bustamante-Davila*, 138 Wn.2d 964, 980, 983 P.2d 590 (1999).

Specifically, officers must give the resident the "*Ferrier* warnings." *Ruem*, 179 Wn.2d at 205. *Ferrier* requires that police officers "must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home." 136 Wn.2d at 118. Officers must give these warnings before entering the home because the resident's knowledge of the privilege is a "threshold requirement for an intelligent decision as to its exercise." *Id.* at 117 (quoting *Miranda v. Arizona*, 384 U.S 436, 468, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). "The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter." *Id.* at 118-19.

Since *Ferrier*, we have consistently limited the *Ferrier* warnings to knock and talk procedures. *See, e.g.*, *Ruem*, 179 Wn.2d at 206; *Khounvichai*, 149 Wn.2d at 562-64. In this case, the officers conducted a knock and talk because they sought Budd's consent to enter his home to search for and seize suspected contraband. Therefore, the officers were required to give Budd the *Ferrier* warnings before entering his home.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*B. We agree with the Court of Appeals and reaffirm that the* Ferrier *warnings must be given before entry of the home in knock and talk investigations*

The State makes two arguments, inviting us either not to apply the *Ferrier* warnings to Budd's case or to limit the requirements of *Ferrier*. First, the State argues that the officers did not conduct a knock and talk because they entered the home only to seize an item, not to conduct a search. Second, the State argues that even if the officers did conduct a knock and talk, *Ferrier* should be read as to allow officers to enter the home first, give the warnings, and then begin their search. We reject both arguments because they are contrary to our reasoning in *Ferrier.*

In *Ferrier*, officers received a tip that Ferrier was illegally growing marijuana in her home. 136 Wn.2d at 106. This tip came from Ferrier's son, whom the officers did not want to disclose as their informant. *Id.* at 107. Believing that they could not obtain a search warrant without disclosing the informant's identity, the officers decided to conduct a knock and talk to gain warrantless entry into Ferrier's home for the purpose of discovering the marijuana grow operation. *Id.*

Carrying out the knock and talk, the officers went to Ferrier's home, and Ferrier opened the door in response to their knock. *Id.* The officers immediately identified themselves, and Ferrier invited them inside her home. *Id.* After the officers entered, they told Ferrier that they had information about a marijuana grow operation and asked for her consent to search her home. *Id.* at 108. Although the officers went over a "consent to search" form with Ferrier, which she signed, the officers did not tell her that she had the right to refuse consent. *Id.* After signing the consent form, Ferrier led the officers through a locked door in her home, exposing her illegal

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

marijuana grow operation. *Id.* at 108-09. The trial court denied Ferrier's motion to suppress the marijuana and found Ferrier guilty of manufacturing a controlled substance, and the Court of Appeals affirmed. *See id.* at 109.

We reversed Ferrier's conviction, ruling that when officers conduct a knock and talk, they must inform residents of their right to refuse consent, revoke consent, and limit the scope of the search before entering the home. *Id.* at 118-19. We adopted this rule in recognition of the strong privacy interests that article I, section 7 of the Washington Constitution provides to the home. *Id.* at 118.

"Central to our holding is our belief that any knock and talk is inherently coercive to some degree":

> [W]e believe that the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search.

*Id.* at 115.

We specifically highlighted the fact that when confronted with a surprise show of government force and authority, most residents believe they have no choice but to consent to the search. *See id.* at 115-16 (noting that we were not surprised by an officer's testimony that virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home). Therefore, we concluded that the constitutional privacy interests residents have in their homes and the coercive nature of knock and talks demand that officers give residents a specific set of warnings (the *Ferrier* warnings) before entering their homes. *Id.* at 118-19. In creating the *Ferrier*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

warnings for use in knock and talk methods of investigation, we recognized that without the *Ferrier* warnings, the State would never be able to prove voluntary consent:

> If we were to reach any other conclusion, we would not be satisfied that a home dweller who consents to a warrantless search possessed the knowledge necessary to make an informed decision. That being the case, the State would be unable to meet its burden of proving that a knowing and voluntary waiver occurred. As the United States Supreme Court has noted in another context: "For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise." *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966). After all, "[a]ssessments of the knowledge that the defendant possessed . . . can never be more than speculation; a warning is a clearcut fact." *Miranda*, 384 U.S. at 468-69, 86 S. Ct. 1602 (footnote omitted).

*Id.* at 116-17 (alterations in original).

Our reasoning in *Ferrier* applies equally in Budd's case. Therefore, we reject both of the State's arguments.

First, the State's distinction between a search and a seizure in the context of a knock and talk is a distinction without a difference. Officers do not seize an item from inside a home without first entering and searching the home for that item. This principle was clear in *Ferrier*, where Ferrier led the officers directly to the marijuana. 136 Wn.2d at 108. That was a search even though the officers did not independently look around Ferrier's residence for contraband. *See id.* at 108, 119. In Budd's case, it makes no difference that the officers knew that Budd owned a computer—their intent to "seize" Budd's computer still placed them inside his home with the intent of finding incriminating evidence.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Second, the State contends that our concerns about the inherently coercive nature of knock and talks should be ameliorated when, as in this case, a resident gives some form of consent outside of the home and then invites the officers into the home to sit together and review the *Ferrier* warnings before starting the search. We reject this argument, as it presents the precise scenario that we rejected in *Ferrier* and ignores article I, section 7 protections of the home. We recognized in *Ferrier* that "virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home." *Id.* at 116. The *Ferrier* warnings are intended to ensure that residents have a fair chance to reject the officers' requests and protect their privacy interests in their homes in the face of the inherently coercive nature of knock and talks. *Id.* at 115-16. Officers must give the *Ferrier* warnings before entering the home because once they are inside the home, the resident is much less likely to withdraw consent, even if the officers do subsequently give the *Ferrier* warnings. Further, once the officers are inside the home, the officers may seize any contraband within their plain view and may be able to use information gathered from inside the home to support a search warrant that they would not otherwise be able to obtain.

Indeed, the officers' conduct in this case paralleled the conduct of the officers in *Ferrier.* In both cases, the officers arrived without announcement, surprising the resident. In both cases, the resident was not given time to reflect on the officers' presence before being asked to give his or her consent for the officers to enter the home and search for evidence of a crime. In both cases, the resident reacted to the knock and talk procedure as expected by being polite and cooperative, and allowing the officers inside the residence.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Therefore, we hold that the officers were required to give Budd the *Ferrier* warnings before entering his home. We next consider the State's argument that remand to the trial court is necessary for further fact-finding on whether Budd actually received the *Ferrier* warnings before the officers entered his home.

III. We affirm the trial court's finding that the officers did not give Budd the *Ferrier* warnings before entering his home and hold that Budd's consent was therefore involuntary

The trial court found that the officers did not give Budd the *Ferrier* warnings before entering his home. Because the officers did not give Budd the *Ferrier* warnings before entering his home, Budd's consent was involuntary. When a court enters written findings of fact and conclusions of law, those findings and conclusions "must be sufficiently specific to permit meaningful review." *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). "While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions." *Id.* Findings may be sufficient even if they are implicit in the trial court's formal written findings of fact. *See State v. Sisouvanh*, 175 Wn.2d 607, 618, 290 P.3d 942 (2012); *Woehler v. George*, 65 Wn.2d 519, 523, 398 P.2d 167 (1965); *Squires v. McLaughlin*, 44 Wn.2d 43, 50, 265 P.2d 265 (1953).

The State asserts that the trial court failed to make any findings of fact on whether the officers provided Budd the *Ferrier* warnings before entering his home and that remand is necessary for the trial court to make that finding. Reviewing the trial court's findings in the context of this hearing makes clear that a remand is unnecessary. The prosecutor and defense counsel both acknowledged at the outset

11

*State v. Budd (Michael Allen)*, No. 91529-6

of the hearing that the key issue was whether Budd was given the *Ferrier* warnings before or after the officers entered the home. The prosecutor stated, "[W]e [are] arguing that the Defendant was advised of his Ferrier warnings prior to the officer going in there. And that he also --- the Defendant waived his rights verbally before he went in and also [signed a] written waiver of rights once he was in the house." CP at 223. Detective Holmes testified that she could not recall "[v]erbatim" how Budd was told he could stop the search at any time, *id.* at 300, and when asked on redirect if she "advised him that he could stop you or stop the search at any time," Holmes answered, "[m]aybe not in those words," *id.* at 302. She immediately added, "But once we went over the *Ferrier* it was exactly those words, yes." *Id.* at 304.

The trial court then heard argument of counsel, which included this colloquy with defense counsel:

> JUDGE: The *Ferrier* case itself and I think the language is, before entering the house the warnings have to be given.
>
> [DEFENSE COUNSEL] DEYOUNG: Right.
>
> JUDGE: Mr. Owens [Deputy Prosecutor] thinks though that that doesn't really mean that. He thinks if there's --- that if the officers go in for limited purposes of sitting down at the kitchen table and going over the written form prior to the search that that satisfies *Ferrier*.
>
> DEYOUNG: Well, we'd have to leave out the part about *Ferrier* about before entering the house and I think Article I § 7, I think that's what *Ferrier* relied on. That's what [it] hung its hat on so to speak.
>
> JUDGE: So, are you aware of any case where that specific issue has been brought up, where the officers went in and went over the warnings inside the house [inaudible]?
>
> DEYOUNG: If I had, we wouldn't be having this hearing or we would have tried to work out some kind of plea deal. No, I'm not aware of any ---

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

JUDGE: Okay.

DEYOUNG: Type of case and I think that that's what makes this case so important and that's I think, if I'm not mistaken, the parties kind of concede that we're not really concentrating on the signed warrant, we're concentrating on what happened before the entry into the house was accomplished because all of that has to be in order.

*Id.* at 339.

The trial court heard Detective Holmes's testimony and considered the arguments of counsel, and the trial court's findings can be reasonably interpreted only as finding that the officers did not give Budd the *Ferrier* warnings before entering his home:

> [T]he troopers did not violate <u>Ferrier</u> by entering the home initially to go over [Budd's] rights before commencing the search. There appears to be no controlling authority on this question. But, the purpose of the <u>Ferrier</u> warnings is to prevent a search before advisement of the rights. Here, no search was conducted before [Budd] was advised of his <u>Ferrier</u> rights, and the purpose of the <u>Ferrier</u> warnings was accomplished.

CP at 407.

This experienced trial judge focused on the policy of *Ferrier*, and whether *Ferrier* allows officers to provide the warnings after entering the home but before beginning the search. The trial judge never found that the officers gave Budd the *Ferrier* warnings while outside. If the trial judge had believed that Budd actually received the *Ferrier* warnings outside, before the officers entered his home, *Ferrier* would have been satisfied at that point and the court would not have considered the adequacy of warnings that the officers provided inside Budd's home. Therefore, by failing to state that Budd actually received the *Ferrier* warnings while outside and focusing on the adequacy of the warnings inside of the home, the trial court implicitly

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

found that Budd did not receive the *Ferrier* warnings before the officers entered his home.[2]

The State, rather than arguing to this court that the trial court's ruling was unsupported by substantial evidence,[3] argues that the Court of Appeals improperly weighed Detective Holmes's testimony to support its decision that Budd's consent was involuntary. We reject this argument because the Court of Appeals correctly read the trial court's findings of fact to mean that the *Ferrier* warnings were not given until Budd admitted the officers into his home. *Budd*, 186 Wn. App. at 199.[4] Moreover, the

---

[2] Even if we were to accept that the trial court did not make this finding, its absence would require us to hold that the State failed to meet its burden of proof. *See State v. Armenta*, 134 Wn.2d 1, 14, 948 P.2d 1280 (1997) ("In the absence of a finding on a factual issue we must indulge the presumption that the party with the burden of proof failed to sustain their burden on [that] issue.").

[3] Given Detective Holmes's testimony, the trial court could have decided either way whether the officers gave Budd the *Ferrier* warnings before entering his home. Regardless, we would affirm the trial court's finding as being supported by substantial evidence. *See State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) (stating that challenged findings that are supported by substantial evidence are binding on appeal). On cross-examination, after Detective Holmes admitted that she did not state in her report that she gave Budd the *Ferrier* warnings before entering his home, defense counsel asked if she advised Budd of his right to call off the search at any time before entering his home. Detective Holmes responded, "Verbatim I don't recall. In general, he --- we told him that . . . [we] were asking him for consent and he certainly had the right to deny that consent. He did not have to let us into the house, and he could stipulate his parameters, which he did." CP at 300. On redirect, Detective Holmes affirmed that she perhaps did not tell Budd that he could stop the search at any time "in those words." *Id.* at 302.

[4] Of our various disagreements with the dissent, we highlight the dissent's assertion that "nothing in the record supports the majority's implied finding that *Ferrier* warnings were *not* provided." Dissent at 10. Arguing that Detective Holmes did provide Budd the *Ferrier* warnings before entering his home, the dissent recites portions of Detective Holmes' testimony and statements by the trial judge. *Id.* at 10-13. But Detective Holmes' testimony was equivocal. The dissent glosses over the trial court's finding that the troopers did not violate *Ferrier* by entering Budd's home to go over the warnings before commencing the search, which necessarily means that the troopers did not give Budd the warnings before entering his home. CP at 407. Rather, the dissent inappropriately substitutes its evaluation

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

State argues that the Court of Appeals looked at Budd's suppression motion brief for extraneous evidence that Budd contested whether the officers gave him the *Ferrier* warnings before entering his home. It is entirely appropriate to consider a party's briefing in order to determine whether an argument was raised at the trial court. Moreover, the excerpts of the record of the suppression hearing quoted above make it quite clear that the major dispute between the parties was whether the officers gave Budd the *Ferrier* warnings before or after entering the house.

## CONCLUSION

We affirm the Court of Appeals for the reasons expressed in this opinion and remand to the trial court with directions to dismiss the charge against Budd.

---

of Detective Holmes' testimony for that of the trial court and makes its own findings of fact where the trial court made none. *See, e.g., State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010) ("[W]e defer to the fact finder on issues of witness credibility."); *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 127-28, 615 P.2d 1279 (1980) ("[I]t is not the function of an appellate court to second guess the trial court by reweighing evidence.").

Wiggins, J.

WE CONCUR.

Stephens, J.

Gordon McCloud, J.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

No. 91529-6

YU, J. (dissenting)—As Judge Korsmo wryly observed in his dissent below, "No good deed goes unpunished." *State v. Budd*, 186 Wn. App. 184, 208, 347 P.3d 49 (2015). Here, Detective Kim Holmes made the mistake of accepting respondent Michael Budd's invitation to enter his home for the purpose of reaffirming in writing the consent he had already given verbally in his driveway.

This was not the kind of coercive and improper fishing expedition that we repudiated in *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998), yet the majority insists that warnings were required and finds that they were not adequately provided here. This conclusion misinterprets the trial court's ruling, is contrary to *Ferrier* itself and its progeny, and is not supported by the evidence. I respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

ANALYSIS

In *Ferrier*, we adopted a narrow rule requiring adequate warnings "when police officers conduct a knock and talk *for the purpose of obtaining consent to search a home.*" *Id.* at 118 (emphasis added). We began articulating the boundaries of this rule almost as soon as it was adopted. *See State v. Bustamante-Davila*, 138 Wn.2d 964, 980, 983 P.2d 590 (1999). Subsequent cases have "clarified that the *Ferrier* requirement is limited to situations where police request entry into a home for the purpose of obtaining consent to conduct a warrantless search." *State v. Khounvichai*, 149 Wn.2d 557, 563, 69 P.3d 862 (2003) (citing *State v. Williams*, 142 Wn.2d 17, 28, 11 P.3d 714 (2000)); *see also State v. Ruem*, 179 Wn.2d 195, 205, 313 P.3d 1156 (2013); *State v. Vy Thang*, 145 Wn.2d 630, 637, 41 P.3d 1159 (2002).

We have declined to adopt a bright-line rule requiring *Ferrier* warnings in every instance when the police enter someone's home. *See Ruem*, 179 Wn.2d at 206; *Williams*, 142 Wn.2d at 27. These decisions demonstrate that under *Ferrier*, "[i]t is not mere entry into the home that is prohibited, absent informed consent, but entry for the specific purpose of obtaining consent to search the home." *Budd*, 186 Wn. App. at 211 (Korsmo, J., dissenting).

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

A. *Ferrier* warnings were not required

While I do not question the wisdom of *Ferrier*, I disagree that the rule applies in this case. We have stated that "when police seek to conduct a warrantless search of the home, the *Ferrier* warnings achieve their purpose." *Khounvichai*, 149 Wn.2d at 564. Because the authorities did not seek to conduct a search of Budd's home, requiring warnings in these circumstances unnecessarily broadens *Ferrier*'s reach without furthering its underlying policies.

Detective Holmes' interaction with Budd does not resemble the "knock and talk" procedure that was at issue in *Ferrier*. In *Ferrier*, the police lacked probable cause and admitted to conducting the knock and talk procedure to circumvent the warrant requirement. *Ferrier*, 136 Wn.2d at 115. Well-armed police arrived at Debra Ferrier's house in black raid uniforms and surrounded her home in a "great . . . show of force." *Id.* at 107, 115. We found it "significant to our analysis . . . that Ferrier was in her home when the police initiated contact with her." *Id.* at 115. The police did not explain why they were there or ask for consent to search until *after* gaining entry into Ferrier's home, nor did they advise Ferrier of her rights prior to entering the house. *Id.* at 107-09.

Characterizing this case as analogous to *Ferrier*, the majority glosses over material factual differences. Here, Detective Holmes received an anonymous cybertip from the National Center for Missing and Exploited Children, Clerk's

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Papers (CP) at 137-51, indicating that Budd was communicating with underaged girls online, possessed child pornography on his computer, and had bragged about molesting his nine-year-old daughter. *Id.* at 134, 231-33. Detective Holmes decided to contact Budd in person out of concern for the welfare and safety of his young daughter. *Id.* at 134, 237. There is no evidence that this was merely a pretext for conducting a warrantless search. Accompanied by two plainclothes state troopers, Detective Holmes initiated contact with Budd *outside* of his home in the driveway. *Id.* at 245. While still in the driveway, Detective Holmes informed Budd of why she and the troopers were there. *Id.* at 134, 245. Budd expressed that he was not surprised because "'[y]ou do it long enough, you eventually get caught'" and, without prompting, admitted to possessing hundreds of images of child pornography. *Id.* at 134. It was only after Budd's confession that Detective Holmes requested consent to enter the home to seize Budd's computer.

We have stated that "*Ferrier* warnings target searches and not merely contacts between the police and individuals," and have repeatedly "declined to broaden the rule to apply outside the context of a request to search." *Khounvichai*, 149 Wn.2d at 564, 563. Not only were the circumstances of the interaction here fundamentally different from *Ferrier*, the purpose of the troopers' actual entry into Budd's residence was different as well. In *Ferrier*, the police entered in order to request consent to search for contraband and/or evidence of a crime. 136 Wn.2d at

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Here, having already obtained Budd's consent, the state troopers entered for the limited purpose of having Budd sign the *Ferrier* form and to seize his computer.

The majority's assertion that the "distinction between a search and a seizure in the context of a 'knock and talk' is a distinction without a difference," majority at 9, is contradicted by our case law. In fact, we rejected this very argument in *Khounvichai*, 149 Wn.2d at 564-66. The defendant in that case argued that *Ferrier* warnings were required when the police entered a home to question a resident "because a police officer's request to enter a home to talk to an occupant about an alleged offense has the same result as a request to enter to search—a warrantless 'search' for anything in plain view." *Id.* at 564. Observing that "[i]t is well established that a discovery made in plain view is not a search," we dismissed the argument that "every entry potentially involves a plain view 'search'" as unavailing. *Id.* at 565-66 (relying on *State v. Miller*, 121 Wash. 153, 154, 209 P. 9 (1922)). The argument should be equally unavailing here, where it is undisputed that the troopers entered in order to seize Budd's computer, not to conduct a search of his home. If the mere fact of entry constituted a search, then *Ferrier* warnings would be required whenever police enter a home. But, as discussed above, we have explicitly declined to adopt such a rule, *see Ruem*, 179 Wn.2d at 206;

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Williams*, 142 Wn.2d at 27-28, and we have acknowledged that there are circumstances in which *Ferrier* warnings are not required prior to entry.

What further distinguishes this case is the fact that unlike Ferrier, who was stunned into acquiescing to the unlawful search of her home, *see Ferrier*, 136 Wn.2d at 108-09, Budd actively negotiated the scope of his consent. Detective Holmes initially requested consent to preview Budd's computer but, at Budd's request, agreed to seize the computer instead. When confronted by the troopers outside in his driveway, Budd asked if they had a warrant. CP at 211-12, 405. In response to Detective Holmes' statement that she would obtain a warrant if he did not consent, Budd indicated that he did not want the troopers to search his house or his computer in front of his girlfriend. *Id.* at 251-53, 292. Apparently determining that a "low-key" seizure of his computer would be preferable to a full-blown search of his home pursuant to a warrant, Budd gave his consent for the troopers to enter his home for the limited purpose of seizing his computer. *Id.* at 197. This exchange indicates that Budd was not only aware of and understood his rights but, in fact, exercised them.

Moreover, we have stated that "[w]hen police obtain consent to search a home pursuant to a 'knock and talk' they go through private belongings and affairs without restriction. Such an intrusion into privacy is not present, however, when police seek consensual entry to question a resident." *Khounvichai*, 149 Wn.2d at

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

564. Similarly, we concluded in *Williams* that "[c]onsidering the limited purpose of the police entry [to execute an arrest warrant] . . . this case does not resemble a 'knock and talk' warrantless search that *Ferrier* intended to prevent." 142 Wn.2d at 27. The same is true where the purpose of entry is limited—by the homeowner himself—to the seizure of a specific piece of evidence. At Budd's direction, Detective Holmes and the troopers agreed "not to open --- you know, go through his entire house opening up his drawers and you know, going through his girlfriend's stuff or whatever else that may be there. Not to ransack the house, so to speak. We just did go in, take the computer and other related media and leave." CP at 294.

The facts in this case simply do not constitute the same unduly coercive circumstances that we were concerned with in *Ferrier*. Consequently, requiring warnings in this case "does not further the constitutional reason for the warnings." *Khounvichai*, 149 Wn.2d at 566. We observed in *Ferrier* that the inherent coerciveness of knock and talk procedures can "be mitigated by requiring officers who conduct the procedure to warn home dwellers of their right to refuse consent to a warrantless search." *Ferrier*, 136 Wn.2d at 116. Thus, requiring warnings prior to entry into a defendant's home would protect the expectation of privacy in the home "'which a citizen of this state should be entitled to hold.'" *Id.* at 118 (quoting *City of Seattle v. McCready*, 123 Wn.2d 260, 270, 868 P.3d 134 (1994)).

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Here, Budd was not in his home when he was contacted by the authorities and his actions demonstrate that he was informed of and exercised his rights.

B. The majority misinterprets the trial court's ruling, and its implied finding is not supported by the evidence

The bare facts of this case show that Budd was not confronted with the coercive circumstances that prompted us to adopt the *Ferrier* rule. By shoehorning *Ferrier* into a situation where it does not belong, the majority misinterprets the trial court's ruling as implicitly finding that *Ferrier* warnings were not properly given. An appellate court should not make an implicit finding of an essential fact unless "the facts and circumstances clearly demonstrate that the finding was actually made by the trial court." *In re Welfare of A.B.*, 168 Wn.2d 908, 927, 232 P.3d 1104 (2010). Reading the trial court's memorandum opinion in its entirety, and in conjunction with statements made at the suppression hearing, it is apparent that the trial court determined correctly that *Ferrier* did not apply.

The majority focuses on the trial court's discussion of *Ferrier*—a scant four sentences—to the exclusion of the memorandum's broader context. The trial court never categorized the interaction as a knock and talk procedure and devoted the bulk of its analysis to determining the voluntariness of Budd's consent under the "totality of the circumstances" standard rather than under *Ferrier*. CP at 406-07. We have held that the totality of the circumstances standard is used *outside* the

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

context of knock and talk procedures. *See Ruem*, 179 Wn.2d at 207; *Thang*, 145 Wn.2d at 637; *Bustamante-Davila*, 138 Wn.2d at 981. It is reasonable to expect that the "experienced trial judge," majority at 13, who was certainly aware of *Ferrier*, *see* CP at 330-41, would have applied the *Ferrier* rule if it had determined that *Ferrier* was the proper standard. The trial judge's observation at the hearing that "the Court itself has seemed to retreat from the plain language rather consistently since the --- since *Ferrier* was published," *id.* at 341, lends further credence to the argument that the trial court determined that *Ferrier* did not apply.[1]

That this was the court's conclusion is further indicated by the court's recitation of the facts:

> Upon entering the Defendant's home and before searching the computer, the troopers went over a written consent form with the Defendant which contained all the warnings associated with State v. Ferrier, 136 Wash. 2d 103, 960 P.2d 927 (1998). The Defendant signed the document acknowledging he understood and *reaffirming* his consent.

*Id.* at 405 (emphasis added). Characterizing the written consent form as "reaffirming" Budd's consent comports with the trial court's conclusion that valid

---

[1] The trial court's conclusion that "the troopers did not violate Ferrier by entering the home initially to go over the Defendant's rights before commencing the search," CP at 407, does not necessitate a finding that proper *Ferrier* warnings were never given, as the majority contends. Majority at 14 n.4. The assessment that the detectives entered Budd's home "initially" to go over the consent form in no way precludes that proper warnings were given prior to entry. Furthermore, even assuming that *Ferrier* warnings were not given—which is not supported by the evidence—this statement is entirely consistent with the trial court's apparent and correct belief that *Ferrier* did not apply.

9

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

consent was obtained *prior* to entering Budd's home. Because Budd gave consent before the authorities entered his home, the *Ferrier* form was merely an additional assurance—a "standard procedure," *id.* at 290, that simply memorialized Budd's prior consent in writing.

Moreover, it cannot be said that "the facts and circumstances clearly demonstrate that the finding was actually made by the trial court," *A.B.*, 168 Wn.2d at 927, since nothing in the record supports the majority's implied finding that *Ferrier* warnings were *not* provided. The majority itself concedes that "the trial court could have decided either way whether the officers gave Budd the *Ferrier* warnings before entering his home." Majority at 14 n.3. Detective Holmes consistently testified throughout the hearing that she had advised Budd of his rights in accordance with *Ferrier*—that is, prior to entry into his home. No evidence to the contrary was presented.

When asked, "[D]id you advise [Budd] of anything before going into the house to search," Detective Holmes testified that "[w]hen [Budd] agreed to give consent, I explained to him that I have a waiver that he would need to sign and it would give him rights as to how much we could search, that he could stop the search. I didn't go into great detail." CP at 253. Deputy Prosecutor Ed Owens then clarified:

10

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

>    OWENS: Now, after you advised him of the rights with this *Ferrier* warning said, you know, the right that he could stop the search at any time, the right that you can allow him to do that, was this advised to him before you went into the house?
>
>    HOLMES: Yes.
>
>    OWENS: And then, did the Defendant still, after you advised him of those things, what this warning was, did he still allow you to go into the house?
>
>    HOLMES: He did. He invited us into the house.

*Id.* at 255.

Later, when the defense attorney objected to the form of a question, the

judge clarified the testimony:

>    JUDGE: Would you state your question again for me please?
>
>    OWENS: Okay and I was gonna ask her when she advised him that he had that right to refuse, did he tell her no or he wanted to refuse.
>
>    JUDGE: Well, apparently, my understanding of the testimony, she did that twice. *She did it once outside and once inside* ---
>
>    OWENS: Yes and now I'm outside. I just took a step back outside and going to the part of if he refused at any time. That he understood that it was taking place.
>
>    . . . .
>
>    JUDGE: Okay, Detective, between the time that you told Mr. Budd *outside the home* that he had the right to refuse consent for entering the home and the time that you entered the home, during that time period at any time did Mr. Budd indicate[] that he wanted to exercise that right?
>
>    HOLMES: No.

*Id.* at 264-66 (emphasis added).

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

When asked during cross-examination how she communicated to Budd that he had the right to refuse, Detective Holmes testified, "Verbatim I don't recall. In general, he --- we told him that, you know, we were asking him for consent and he certainly had the right to deny that consent. He did not have to let us into the house and he could stipulate his parameters, which he did." *Id.* at 300. And again, on redirect:

> OWENS: Very well. Now, you just testified in regards to the *Ferrier* warnings, the talking prior to going into the house with the Defendant there. Now, you stated you advised [Budd] that he could deny entrance into the house?
> HOLMES: Yes.
> OWENS: And you advised him that he could stop you or stop the search at any time?
> HOLMES: Maybe not in those words ---
> OWENS: Right.
> HOLMES: But once we went over the *Ferrier* it was exactly those words, yes.
> OWENS: Okay, but I'm talking before you go into the house what you were talking about in the driveway. Did you advise him about parameters?
> HOLMES: Yes.

*Id.* at 302-04.

Nothing in the record contradicts Detective Holmes' testimony that she adequately apprised Budd of his rights in accordance with *Ferrier*. The majority suggests that Detective Holmes' inability to recall the verbatim language that she used supports the conclusion that *Ferrier* warnings were not provided. Majority at 14 n.3. Judge Korsmo astutely observed that "[f]ailure to recall specific verbiage

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

is not the same thing as failing to provide the information." *Budd*, 186 Wn. App. at 210 (Korsmo, J., dissenting). I agree.[2] *Ferrier* warnings are not a shibboleth—it is the extent of the warnings, not the exact language employed, that determines whether the rule has been satisfied.

When considering the entirety of the record from the suppression hearing, the majority's implied finding that *Ferrier* warnings were not provided has no support in the facts or the circumstances. What the record *does* show is that even if *Ferrier* did apply, Detective Holmes provided Budd with adequate warnings prior to entering his home.

## C. The proper remedy for insufficiently specific findings is remand

The trial court made no explicit findings as to whether or not *Ferrier* warnings were provided prior to entry into Budd's home. The majority asserts that if an implicit finding cannot be made, the appropriate remedy is not remand but to hold that the State failed to meet its burden of proof. Majority at 14 n.2. This might be true if the trial court had determined the validity of Budd's consent under *Ferrier* rather than the totality of the circumstances standard. However, the

---

[2] It appears that the trial judge would agree as well. When discussing *Ferrier* with the State during arguments at the suppression hearing, the trial judge asked, "Well, isn't the testimony from Detective Holmes fairly clear on that point? I mean, didn't she testify that she advised, she didn't have the exact words, but had advised Mr. Budd of the substance of these three --- three rights [inaudible] *Ferrier* before they went in the house?" CP at 337.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

majority's proffered approach is incorrect because the State satisfied its burden of proof under the applicable standard.

The State's burden at the suppression hearing was to prove that Budd's consent was voluntary. *See Bustamante-Davila*, 138 Wn.2d at 981 (citing *State v. Shoemaker*, 85 Wn.2d 207, 210, 533 P.2d 123 (1975)). The trial court correctly concluded that Budd's consent was voluntary under the totality of the circumstances standard, and the evidence is sufficient to support this conclusion. Because the State met its burden under the applicable standard, the court did not need to reach the *Ferrier* question.

While the court was not required to address *Ferrier* in order to arrive at its conclusion that Budd's consent was valid, the State correctly observed that "[m]any of the serious *Ferrier* and constitutional issues raised in this petition for review might be rendered moot with clarified findings of fact from the trial court." Pet. for Review at 15. "[A] trial court is not required to make findings of fact on all matters about which there is evidence in the record; only those which establish the existence or nonexistence of determinative factual matters need be made." *In re Det. of LaBelle*, 107 Wn.2d 196, 219, 728 P.2d 138 (1986). To the extent that the question of whether or not *Ferrier* warnings were, in fact, provided constitutes a "determinative factual matter[]," *id.*, for which the trial court's findings were not sufficiently specific, I agree with Judge Korsmo that "[w]hen the findings are not

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

clear or fail to address an important point, the remedy is to remand for better

findings," *Budd*, 186 Wn. App. at 210 (Korsmo, J., dissenting) (citing

*State v. Head*, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998); *State v. Alvarez*, 128

Wn.2d 1, 19, 904 P.2d 754 (1995); *State v. Barber*, 118 Wn.2d 335, 342, 823 P.2d

1068 (1992)). The more prudent course of action here would be to seek

clarification from the trial court rather than imply findings that are not supported

by the record.

CONCLUSION

By broadening the application of *Ferrier* beyond what common sense and

our cases allow, the majority's opinion leads to an "extraordinary" and troubling

result: the suppression of physical evidence obtained from a cooperative defendant

who freely offered a confession and gave voluntary and informed consent to enter

his home for the limited purpose of seizing the physical evidence. *See* Br. of

Resp't at 10. We have consistently limited *Ferrier* to its facts, and this case does

not warrant veering away from our case law. I would hold that *Ferrier* does not

apply and reinstate the trial court's decision to deny Budd's motion to suppress.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Budd*, No. 91529-6
(Yu, J., Dissenting)

Yu, J

Fairhurst, J.

González, J.

Madsen, C.J.

16