# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 76119-6-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| STEVEN M. MARSHALL, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 25, 2019 |
| | ) | |

LEACH, J. — Steven M. Marshall appeals his convictions for murder in the first degree and second degree unlawful possession of a firearm. Marshall filed pro se motions with the trial court while counsel represented him. He claims that testimony about these motions violated his constitutional right to access the courts and ER 403. He also contends that the prosecutor committed prejudicial misconduct when she elicited a lay witness's opinion about his guilt.

First, because a criminal defendant does not have a constitutional right to hybrid representation, testimony about Marshall's pro se motions did not penalize him for exercising his constitutional rights to access the courts. And Marshall did not preserve his ER 403 claim for appeal because he did not raise it in the trial court. Second, when, as here, defense counsel does not object at trial to the alleged prosecutorial misconduct, the defendant must show that the misconduct

was so flagrant and ill-intentioned that a jury instruction would not have cured any prejudice. Because Marshall does not show this, we affirm.

FACTS

Ryan Prince helped Michael Helsel-Perkins (Perkins) build medical marijuana dispensaries and manage the dispensaries' employees. Prince lived with Perkins and Perkins's girlfriend, Chelsea Dew, at a house in Renton. Perkins had an alarm system installed at the house. The security system's digital video recorder (DVR) was in a downstairs closet.

On February 17, 2014, Prince arrived home around 8:00 p.m. and disarmed the alarm system. No one else was home. Neighbor James McDonald heard gunshots at Prince's house close to 8:00 p.m. McDonald texted a neighbor at 8:11 p.m., asking if his neighbor also had heard them. He called 911 around 8:20 p.m. From McDonald's balcony, he thought he heard voices or wrestling and saw the silhouettes of more than one person in Prince's house. He testified that before the police arrived, all the lights went off at Prince's house "like they were killed with a circuit breaker."

When Deputy William Brown arrived at Prince's house, he saw Prince's vehicle parked in front of the garage with a dry spot next to it where it looked like another car had been parked. All the lights in the house were off. No one answered the door, so Brown left.

Dew returned home later that night and found Prince on the floor in his bedroom with a bloody face and blankets covering his body. Dew called 911. Prince was pronounced dead at the scene. Police collected a pair of broken Burberry-brand eyeglasses on the front porch, which Dew testified did not belong to her, Perkins, or Prince. Both Marshall's brother and ex-wife testified that Marshall sometimes wore Burberry glasses. The only latent print on the glasses matched Marshall's thumb. Someone had removed the alarm system's DVR from the downstairs closet. Police found $27,000 in cash in Prince's backpack in his bedroom.

Police also found a 40-caliber bullet embedded in the bathroom closet, a 40-caliber shell casing just outside the house, a 22-caliber casing in a groove between planks on the porch and on the downstairs landing, a 380-caliber casing in the dining room, and a 40-caliber casing in the dining room. A medical examiner performed an autopsy on Prince and determined that he died from multiple gunshot wounds. She found four gunshot wounds and recovered three bullets from Prince's body.

Police found Prince's cell phone off the side of the road near his house. On Prince's phone they discovered a photograph of a vehicle taken at 8:10 p.m. the night of his murder. The license plate number belonged to a Chrysler PT Cruiser registered to Allison Sierra, Marshall's ex-wife. She testified that

Marshall had been the full-time driver of the PT cruiser since September 2013. She stated that he had been driving it on February 14, 2014, when she last saw him before the incident.

On February 22, the police stopped and arrested Marshall while he was driving a Dodge Durango registered to a girlfriend, Shamarra Scott. Police seized "several" cellular phones from Marshall's person and another that was on the ground near the driver's door of the Dodge. They found a 40-caliber SIG Sauer handgun in a backpack on the front passenger seat. They also found an envelope, an identification card, and a prescription pill bottle with Marshall's name in this backpack. Marshall's DNA (deoxyribonucleic acid) was found on the magazine and ammunition inside the gun. Testing showed that this gun fired the 40-caliber bullet and shell casings found at Prince's house.

Police also searched the contents of Marshall's cell phones and the cell phone of Ryan Erker, Marshall's co-defendant. Marshall and Erker exchanged several text messages and calls with one another using these phones. Their text messages suggested that Erker was monitoring Perkins's dispensaries and attempting to locate his house. On February 6, 2014, Erker sent Marshall a message stating, "Brother, I think I've got the address we've been looking for! I'm having it checked tonight. . . . Keep your fingers crossed. This is the big one." On February 12, Erker texted Marshall, "We know where the honey pot is,

-4-

so we got time, bro." Marshall responded, "Yeah. We'll put it off for another day. Let's shoot for tomorrow."

Cell tower evidence showed primarily Erker's phone and sometimes Marshall's phone connected to the tower closest to Prince's house periodically between February 7 and 17, 2014. Neither phone had connected to the tower closest to Prince's house before February 7. And neither phone connected to that tower after February 17. On February 17, between 8:00 p.m. and 8:40 p.m., Erker and Marshall placed multiple calls to each other. Each of their phones connected to the cell tower closest to Prince's house for some of these calls. At 8:13 p.m., both Erker's and Marshall's cellular numbers connected to the tower closest to Prince's house. Erker called Marshall several times between 8:37 p.m. and 8:41 p.m. All these calls connected to a tower west of the tower closest to Prince's house.

Marshall had another girlfriend at the time, Soqueara Bailey. She testified that on the night of February 17, she heard Marshall's and Erker's voices downstairs but could not hear what they were saying. Late that night, Marshall woke her up and told her, "I fucked up." Marshall had told her similar things in the past when he had impregnated other women. She stated that a few days later, Erker asked her to throw away a DVR or DVD player, which she threw in a dumpster. Paul Steve had bought and sold cars for Erker. He testified that on

February 17, Erker called him to ask him to sell a PT Cruiser because it had been used in a crime.

The State charged Marshall with one count of first degree murder and one count of second degree unlawful possession of a firearm. It alleged that Marshall caused Prince's death while committing or attempting to commit first degree robbery and first degree burglary. It also claimed that Marshall knowingly had a handgun in his possession or control and had previously been convicted of first degree malicious mischief. The jury found him guilty of first degree murder and returned a special verdict finding that he was armed with a firearm during the crime. At a bifurcated bench trial, the trial court found Marshall guilty of second degree unlawful possession of a firearm. Marshall appeals.

## ANALYSIS

### Pro Se Legal Motions

Marshall challenges "the trial court's admission of [his] pro se legal motions as substantive evidence of guilt" on constitutional and evidentiary grounds. We reject his challenges. We also note that information about the content of these motions was admitted through Scott's testimony only; contrary to Marshall's argument, the trial court did not admit the motions themselves as exhibits.

The State called Scott as a witness. During her direct examination of Scott, a prosecutor asked about handwritten documents that Marshall had mailed to Scott before trial. Scott testified that she helped Marshall put some of these documents on pleading paper. While represented by an attorney, Marshall filed these pleadings as pro se motions on his own behalf. He filed a "motion to challenge search warrant" and "request for Franks[1] hearing." He asked the court to suppress evidence that the police obtained from Sierra, including evidence from the search of her cell phone. Marshall also filed a "motion to suppress evidence pursuant [to] CrRLJ 3.6," requesting suppression of the Burberry glasses found at Prince's house.

At trial, Scott identified exhibit 106 as "a motion to suppress," which she confirmed were the handwritten documents that Marshall had mailed to her. The State asked, "Motion to suppress what?" Defense counsel objected "as to relevance." The trial court sustained the objection. The State then asked about the similarities between Marshall's assertions in these documents and the declaration that Scott filed with the court after receiving them. The State offered exhibit 106 into evidence, and Marshall objected based on relevance. The State reserved the issue. Scott testified that the documents she received from Marshall included assertions about police treating Sierra poorly. The State asked

---

[1] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

what the documents said about Sierra. Marshall objected based on hearsay and relevance. Outside of the presence of the jury, the State maintained, "[W]ithin these pleadings is Mr. Marshall's theory of the case." The State asserted that it was offering the handwritten letters "strictly for Mr. Marshall's consciousness of guilt, his attempt to influence the statement of other witnesses, [and] his successful attempt to do it." Marshall maintained his previous objection.

The trial judge stated, "As I think has come up before, I mean, there's no such thing as hybrid representation. Mr. Marshall [is] represented by Counsel. I consider motions presented by Counsel when an individual decides to send documents out into the world, they send documents out into the world." The trial court ruled that Marshall's statements in the documents he sent Scott were not hearsay. But it stated that the motions contained statements that were "maybe subject to a 403 analysis," including Marshall's mention of spousal privilege, Ferrier[2] warnings, and Miranda.[3]

The State stated that it would prepare a redacted version of exhibit 106.[4] Marshall's counsel responded, "[T]here's a 403 objection as well, but it's all the same thing. If [the State is] going to inquire as to portions [of the exhibit], we'll

---

[2] State v. Ferrier, 136 Wn.2d 103, 960 P.2d 927 (1998).

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] The record does not show that the State ever prepared a redacted version of exhibit 106 or that the trial court ever admitted exhibit 106 as an exhibit.

just raise objections as those come forward." The trial court ruled that because the question to which Marshall had objected had asked what exhibit 106 said about Sierra and the document said a lot about her, some of which may be inadmissible, Marshall's objection was sustained on "that phrasing."

Then, twice over Marshall's relevance objections, the State asked Scott if Marshall had asked her to type his motions, in part, to prevent Sierra's cell phone from being available in evidence. Without objection, the State proceeded to elicit more testimony about the factual statements in exhibit 106 and about Scott's encounter with the police.

Again, without objection, Scott testified that one of the handwritten motions Marshall sent her asked the court to suppress evidence about the gun found in the backpack in her Durango. The State showed Scott exhibit 108, which Scott confirmed were the motions that she had typed for Marshall based on the documents he sent her. The record does not show that the trial court admitted exhibit 108. Marshall did not object when Scott confirmed that one of the motions asked the court to suppress evidence about the pair of Burberry eyeglasses found at the scene based on Marshall's claim that they were not his. Marshall also did not object when the prosecutor read paragraphs from the motions detailing Marshall's argument about the glasses.

*A. Constitutional Claim*

First, Marshall claims that Scott's testimony about his pro se legal motions violated his constitutional rights to access the court system, to due process, and to have inadmissible evidence suppressed. We reject this claim.

As a preliminary matter, the State contends that Marshall did not preserve this claim below. An appellate court may refuse to review any claim of error that a party did not raise in the trial court unless one of three exceptions applies.[5]

First, Marshall claims that his trial counsel raised the issues at trial. Normally, a party may appeal an evidence decision only on the specific ground of the objection made at trial.[6] But an appellate court will review an evidence ruling if the specific basis for the objection is "'apparent from the context.'"[7] Here, when the State asked Scott what the letters said about Sierra, Marshall's trial counsel objected, stating, in part, "It seems to me that Mr. Marshall is entitled to create legal pleading. He's done that." Marshall contends that this objection informed the trial court that he had a right to file legal motions and preserved his claim that testimony about his pro se motions violated his constitutional right to access the courts. Marshall also claims that his counsel's objections based on relevance

---

[5] RAP 2.5(a).

[6] State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

[7] State v. Braham, 67 Wn. App. 930, 935, 841 P.2d 785 (1992) (internal quotation marks omitted) (quoting State v. Pittman, 54 Wn. App. 58, 66, 772 P.2d 516 (1989)).

"further alerted the trial court to the dispositive issue" that Marshall was exercising his right to file legal motions.

The trial court responded, in part, "[T[here's no such thing as hybrid representation." Marshall asserts that this statement means the trial court "clearly understood the nature of the constitutional objection" because the central issue on appeal is "tension" between the right to access the court system and the lack of a right to hybrid representation. But because Marshall now challenges testimony about his pro se motions based on his constitutional right to access the court system, not based on a claimed right of hybrid representation or relevance, his trial counsel's objections were not sufficiently related to his current constitutional claim to preserve it.

Alternatively, Marshall asserts that admission of his pro se motions during trial qualifies as manifest constitutional error, reviewable for the first time on appeal under RAP 2.5(a)(3). An error is manifest if it caused actual prejudice.[8] This means the defendant must make a plausible showing that the asserted error had practical and identifiable consequences in the trial.[9] But this court first decides whether the alleged error implicates a constitutional right. To determine if an error is of constitutional magnitude, a reviewing court assumes the alleged

---

[8] State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).
[9] Kirkman, 159 Wn.2d at 935.

error occurred and then assesses if that error actually violated the defendant's constitutional rights.[10]

Criminal defendants have a constitutional right to counsel.[11] They also have a constitutional right to waive assistance of counsel and represent themselves.[12] Marshall acknowledges, however, that they do not have a state or federal constitutional right to "hybrid representation," through which defendants may serve as co-counsel with their attorneys.[13] Represented defendants have no constitutional right to file pleadings with the trial court.[14] But Marshall contends that individuals do have a constitutional right of access to the courts to redress grievances, which "is rooted in the petition clause of the First Amendment to the United States Constitution."[15] They also have a constitutional right to suppression of illegally obtained evidence.[16] And individuals may not be penalized for the lawful exercise of a constitutional right.[17] Marshall relies on three cases to illustrate this principle.

---

[10] State v. Kalebaugh, 179 Wn. App. 414, 420-21, 318 P.3d 288 (2014).
[11] State v. Romero, 95 Wn. App. 323, 326, 975 P.2d 564 (1999).
[12] Romero, 95 Wn. App. at 326.
[13] Romero, 95 Wn. App. at 326.
[14] State v. Blanchey, 75 Wn.2d 926, 938, 454 P.2d 841 (1969).
[15] In re Pers. Restraint of Addleman, 139 Wn.2d 751, 753-54, 991 P.2d 1123 (2000).
[16] State v. Duncan, 146 Wn.2d 166, 170, 176, 43 P.3d 513 (2002).
[17] State v. Burke, 163 Wn.2d 204, 221, 181 P.3d 1 (2008).

First, Marshall relies on In re Personal Restraint of Addleman,[18] where our Supreme Court held that the Indeterminate Sentencing Review Board's decision to deny Addleman parole, in part, because of the litigation and personal grievance actions he had filed, violated Addleman's constitutional right of access to the judicial system. Second, Marshall cites State v. Burke,[19] where our Supreme Court held that the prosecution's use of Burke's silence as substantive evidence of his guilt violated the Fifth Amendment and article I, section 9 of the Washington Constitution. Third, Marshall relies on State v. Gauthier,[20] where this court held that the prosecution's presentation of evidence that Gauthier refused to consent to warrantless sampling of his DNA as substantive evidence of his guilt violated Gauthier's right to invoke with impunity his Fourth Amendment and article I, section 7 protections.

While the trial court did not admit Marshall's pro se motions into evidence, he claims that like these three cases, "the trial court's admission of [his] pro se legal motions as substantive evidence of guilt penalized him for the lawful exercise of his constitutional right[ ]" to access the court system and have illegally obtained evidence suppressed. In Addleman, Burke, and Gauthier, the conduct at issue penalized the defendants for exercising a constitutional right: the right to redress grievances, the right to remain silent, and the right to refuse consent to a

---

[18] 139 Wn.2d 751, 753-56, 991 P.2d 1123 (2000).
[19] 163 Wn.2d 204, 208-10, 221-23, 181 P.3d 1 (2008).
[20] 174 Wn. App. 257, 261-63, 267, 271, 298 P.3d 126 (2013).

warrantless sampling of DNA. But here, a defendant's rights to access the court system and have illegally obtained evidence suppressed do not include a constitutional right to file pro se pleadings while represented by counsel. By accepting legal representation, Marshall gave up the right to contribute to his defense by filing pleadings. If a represented defendant wants to file a motion to suppress, he has a constitutional right to do so only through his counsel. Because a represented defendant does not have a constitutional right to hybrid representation, Scott's testimony about Marshall's pro se motions did not violate any constitutional right of Marshall. He does not show manifest constitutional error.

*B. Evidentiary Claim*

Alternatively, Marshall claims that the trial court abused its discretion by admitting testimony about his pro se motions in violation of ER 403. As a preliminary issue, the State contends that Marshall did not preserve this claim on appeal because he objected on the basis of ER 403 only once and the court sustained that objection. All his other objections cited as grounds either relevance or hearsay.

The State correctly describes the record. Marshall made an ER 403 objection to the State's question about what the letters that Marshall mailed to Scott said about Sierra. And the trial court did sustain this objection. Then

Marshall's trial counsel stated that he would object to questions the State asked about the exhibit as necessary going forward. Marshall's trial counsel based all later objections on relevance and hearsay only. Because this court generally may refuse to review any claim of error that a party did not raise at the trial court, we decline to consider Marshall's ER 403 challenge.

### Prosecutorial Misconduct

Next, Marshall claims that the State committed prejudicial prosecutorial misconduct by purposefully eliciting a witness's opinion about his guilt. We disagree.

The State questioned Scott about a letter she wrote Marshall in late February or early March of 2014. Marshall did not object to the State's questions.

Q. You wrote him an eight-page letter. And, in this statement, you told the detective that in that letter, you asked him, you told him, that he needed to remove the wickedness from his life; is that correct?

A. That's correct.

Q. What wickedness?

A. Everybody has wickedness, because everyone sins every day. So he needs to ask for forgiveness of his sins from being a young child, from harsh words, what it is you say against other people, thoughts, everything.

Q. When you wrote him this letter, he was in jail for murder, and you had asked him about it, and he told you to shut up. In this letter, did you tell him that he needed to ask God for forgiveness?

A.     We ask God for forgiveness every day.

Q.     <u>Ms. Scott, he needed to ask God for forgiveness for murdering Ryan Prince. Isn't that what you meant?</u>

A.     No, that's not what I meant.

[State]:     I don't have any more questions.

(Emphasis added.)

Prejudicial prosecutorial misconduct violates the defendant's Sixth Amendment right to a fair trial.[21] "Defense counsel's failure to object to the misconduct at trial constitutes waiver on appeal unless the misconduct is 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' incurable by a jury instruction."[22]

ER 701 permits lay witness testimony when it is (1) rationally based on the perception of the witness, (2) helpful to the jury, and (3) not based on scientific or specialized knowledge. But opinion testimony about a criminal defendant's guilt violates the defendant's constitutional right to a trial by an impartial jury.[23] A prosecutor commits misconduct when her questioning of a witness asks a witness to provide inadmissible testimony.[24] "A prosecutor has no right to call to

---

[21] <u>State v. Fisher</u>, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009).
[22] <u>Fisher</u>, 165 Wn.2d at 747 (internal quotation marks omitted) (quoting <u>State v. Stenson</u>, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)).
[23] <u>State v. Quaale</u>, 182 Wn.2d 191, 199, 340 P.3d 213 (2014).
[24] <u>State v. Jerrels</u>, 83 Wn. App. 503, 507-08, 925 P.2d 209 (1996).

the attention of the jury matters or considerations which the jurors have no right to consider."[25]

Here, the prosecutor intentionally asked for Scott's opinion about Marshall's guilt when the prosecutor asked Scott if she wrote to Marshall that "he needed to ask God for forgiveness for murdering Ryan Prince." Because this testimony violated Marshall's constitutional right and the prosecutor intentionally elicited it, the prosecutor committed misconduct. But the prosecutor's conduct was not so flagrant and ill-intentioned that an instruction would not have cured any resulting prejudice.

First, Marshall claims that because there were no eyewitnesses to the murder and the primary issue at trial was identity, an instruction could not have cured the resulting prejudice. But the other evidence of Marshall's guilt was sufficiently abundant that an instruction could have cured any resulting prejudice.

Marshall's and Erker's text messages establish that they located Prince's home, referred to it as the "honey pot," and intended to carry out a plan that required them to locate his home. Cell phone data shows them near Prince's house in the days leading up to the murder and at the time of the murder. In addition, police found Burberry eyeglasses with only Marshall's fingerprint at the scene, witnesses testified that they had seen him wear Burberry glasses, and a

---

[25] State v. Belgarde, 110 Wn.2d 504, 508, 755 P.2d 174 (1988).

Facebook picture shows him wearing Burberry glasses. Sierra testified that since September 2013 Marshall had been the primary user of her PT Cruiser, which was photographed at Prince's house at the time of his murder. And Steve testified that Erker asked him to sell that PT Cruiser on the night of the murder because it had been used in a crime. Further, the gun located in Marshall's backpack fired the bullet and some of the cartridge casings found at the scene. After the murder, Marshall told Bailey that he had "fucked up." And only after Scott received a letter from Marshall stating that police treated her poorly did she file a declaration making this claim.

Second, the record does not show that the prosecutor further questioned Scott about her letter or referred to Scott's testimony about the letter at any later point during trial. Marshall relies on State v. Jerrels,[26] where Division Two of this court held the prosecutor committed prejudicial misconduct by asking the child-victims' mother her opinion about whether her children were telling the truth about the alleged sexual abuse. But in Jerrels, "[t]he improper questions were asked three different times, giving them a cumulative effect."[27] This "cumulative effect" is absent here where the prosecutor referenced Scott's letter only the one time while she was questioning Scott.

---

[26] 83 Wn. App. 503, 507-08, 925 P.2d 209 (1996).
[27] Jerrels, 83 Wn. App. at 508.

-18-

Third, Marshall also relies on Jerrels to support the proposition that a loved one's opinion on the guilt of the accused or the veracity of a witness is highly prejudicial. There, the court reasoned that the prosecutor's improper questioning was prejudicial, in part, because "[a] mother's opinion as to her children's veracity could not easily be disregarded even if the jury had been instructed to do so."[28] Here, Scott testified that she has been "considered [Marshall's] common law wife [for s]everal years now." And they have a child together. But she also testified that she has known Marshall for 10 years and they have "been friends in between things. [They]'ve both had other relationships." Indeed, at the time of the murder, Marshall had at least three girlfriends, including Scott. Regardless of how Scott characterizes her relationship with Marshall, her sporadic romantic relationship with him is not like a mother's relationship with her children.

Fourth, Marshall notes that the religious implications of Scott's letter may have been "particularly persuasive for some jurors." The opposite assumption, however, is equally as reasonable. We do not consider this argument persuasive.

---

[28] Jerrels, 83 Wn. App. at 508.

Last, the trial court gave the standard instruction to the jury that the lawyers' remarks, statements, and arguments are not evidence. And "[j]urors are presumed to follow the court's instructions."[29]

For these reasons, we conclude that the prosecutor's misconduct was not so flagrant and ill-intentioned that it could not have been cured by an instruction.

### Statement of Additional Grounds

Marshall makes a number of constitutional challenges in his statement of additional grounds. This court reviews constitutional challenges de novo.[30] We reject Marshall's claims.

*A. Fourth Amendment*

Marshall contends that his Fourth Amendment right to privacy was violated on three grounds. We disagree.

The Fourth Amendment protects individual privacy against certain kinds of governmental intrusions.[31] It guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[32] A search occurs under the Fourth Amendment when the government intrudes upon a subjective and reasonable expectation of privacy.[33]

---

[29] Kirkman, 159 Wn.2d at 937.
[30] State v. Budd, 185 Wn.2d 566, 571, 374 P.3d 137 (2016).
[31] Katz v. United States, 389 U.S. 347, 350, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).
[32] U.S. CONST. amend. IV.
[33] State v. Goucher, 124 Wn.2d 778, 782, 881 P.2d 210 (1994).

First, Marshall claims that the police conducted an illegal pretexutal stop, an illegal seizure, and an illegal custodial interrogation of Sierra. But a party alleging a constitutional claim must have standing.[34] "Fourth Amendment rights are personal rights which may not be vicariously asserted. . . . A defendant may challenge a search or seizure only if he or she has a personal Fourth Amendment privacy interest in the area searched or the property seized."[35] Because the stop and interrogation of Sierra and the search of her cell phone implicate Sierra's privacy interest, not Marshall's, he does not have standing to challenge this conduct under the Fourth Amendment.

Second, Marshall claims that the police interrogation of Sierra violated his privacy right because the spousal privilege statute protects him. RCW 5.60.060(1) prohibits a husband or wife or domestic partner from testifying against the other during their marriage or domestic partnership or after the marriage or domestic partnership about a communication made during the marriage or domestic partnership without the consent of the nontestifying spouse. But Marshall does not contest that at the time of Prince's murder, he and Sierra were divorced and had been in only an "ongoing domestic relationship for over 14 years." An "ongoing domestic relationship" is not a relationship protected by the spousal privilege statute.

---

[34] See Goucher, 124 Wn.2d at 787 ([W]e must decide whether the Defendant has the standing to challenge the scope of this warrant.").

[35] Goucher, 124 Wn.2d at 787.

Third, Marshall claims that the State had the King County Jail intercept his incoming and outgoing mail to his "spouse"[36] without a warrant. But he did not raise this claim below and does not claim manifest constitutional error. Because an appellate court may refuse to review any claim of error that a party did not raise in the trial court unless one of three exceptions applies,[37] we decline to consider Marshall's claim.

## B. Ineffective Assistance of Counsel

Marshall next claims that he received ineffective assistance of counsel on three grounds. We disagree.

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel to help ensure a fair trial.[38] To prove ineffective assistance of counsel, an appellant must show that (1) counsel provided representation so deficient that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced him.[39] To prove deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness.[40] Appellate courts examine trial counsel's performance with great deference, and the defendant must overcome

---

[36] It is unclear to whom Marshall refers when he says "spouse." Sierra is his ex-wife, and Scott testified that she was Marshall's "common law wife."
[37] RAP 2.5(a).
[38] State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).
[39] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).
[40] Strickland, 466 U.S. at 687-88.

the presumption that the challenged action "'might be considered sound trial strategy.'"[41] Counsel's performance is not deficient for failing to object to admissible evidence.[42] The prejudice prong requires that the defendant establish there is a reasonable probability that but for counsel's deficient performance, the outcome of the proceedings would have been different.[43]

First, Marshall claims deficient performance on the ground that his trial counsel did not ask the trial court to suppress the evidence from Sierra's cell phone that Marshall asked the court to suppress in his pro se motions. As discussed above, Marshall does not have standing to challenge the evidence police obtained from Sierra's cell phone. Although Marshall also appears to challenge admission of this evidence based on ER 403, he did not object on this basis at trial, so we decline to consider it under RAP 2.5(a).

Second, Marshall contends that he received deficient performance because his trial counsel did not ask to have a biased juror excused for cause. If the record demonstrates the actual bias of a juror, seating this juror is manifest error.[44] Here, a juror told the court that a friend of hers had died in a home invasion and it "brought back memories and . . . feelings." This juror testified that she did not "think that there's too much of an emotional connection" or that her

---

[41] Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)).
[42] Grier, 171 Wn.2d at 32.
[43] Grier, 171 Wn.2d at 34.
[44] State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015).

"decision-making would be compromised." She thus stated that she could remain impartial, so the record does not demonstrate actual bias.

Third, Marshall maintains that his trial counsel should not have used an "all or nothing" strategy and should have requested lesser-included offense instructions on first and second degree manslaughter. The decision to exclude or include lesser included offense instructions "ultimately rests with defense counsel."[45] In State v. Grier,[46] our Supreme Court reasoned that an all or nothing strategy is not necessarily evidence of deficient performance because the defendant and his counsel could reasonably have believed that this strategy was the best approach to achieve an acquittal. The court also stated Grier did not prove prejudice because the court assumed, as it was required to, that the jury could not have convicted Grier of the charged offense unless the State had met its burden; and the availability of a lesser included offense would not have changed the outcome.[47] Similarly, here, Marshall cannot show prejudice because we must assume that the jury would not have convicted him of first degree murder unless the State met its burden of proof.

## C. Confrontation Clause

Last, Marshall claims Steve's testimony that Erker told Steve, "one of the guys owns the car," violated his Sixth Amendment right to confront witnesses

---

[45] Grier, 171 Wn.2d at 32.
[46] 171 Wn.2d 17, 43, 246 P.3d 1260 (2011).
[47] Grier, 171 Wn.2d at 43-44.

-24-

against him because he was unable to cross-examine Erker. But the record does not show that Steve provided the quoted testimony. We do not consider this claim.

### DNA Fee

Marshall asks that this court strike his $100 DNA fee from his judgment and sentence consistent with our Supreme Court's recent holding in State v. Ramirez.[48] There, our Supreme Court discussed and applied House Bill (HB) 1783, which became effective June 7, 2018, and applies prospectively to all cases on direct appeal.[49] The court stated that HB 1783 amended RCW 43.43.7541 to provide that "the DNA database fee is no longer mandatory if the offender's DNA has been collected because of a prior conviction."[50] The court also explained that HB 1783 "amends former RCW 10.01.160(3) to expressly prohibit courts from imposing discretionary costs on defendants who are indigent at the time of sentencing: 'The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent as defined in RCW 10.101.010(3)(a) through (c).'"[51]

Here, Marshall has a felony conviction from 2011. RCW 43.43.754 would have required that he have a DNA sample collected as a result of that felony.

---

[48] 191 Wn.2d 732, 426 P.3d 714 (2018).
[49] Ramirez, 191 Wn.2d at 747.
[50] Ramirez, 191 Wn.2d at 747.
[51] Ramirez, 191 Wn.2d at 748 (quoting LAWS OF 2018, ch. 269, § 6(3)).

Because Marshall's DNA fee was previously collected, the DNA fee is no longer mandatory under RCW 43.43.7541. The trial court found Marshall indigent and ordered him to pay the $100 DNA fee. Because a trial court may not impose discretionary fees on indigent defendants under RCW 10.01.160(3), we strike Marshall's $100 DNA fee from his judgment and sentence.

## CONCLUSION

We affirm. Testimony about the substance of Marshall's pro se motions that he filed while counsel represented him did not violate his constitutional right to access the courts because a criminal defendant does not have a hybrid right to representation. Because ample evidence supports Marshall's guilt, he does not show that the prosecutor's misconduct caused him prejudice.

_Leach, J._

WE CONCUR:

_Chun, J._     _Verellen, J._